413 F.Supp. 43 (1976)
UNITED STATES FIDELITY & GUARANTY COMPANY, Plaintiff,
v.
ROYAL NATIONAL BANK OF NEW YORK and Merrill Lynch, Pierce, Fenner & Smith, Inc., Defendants.
No. 68 Civ. 2054 (HFW).
United States District Court, S. D. New York.
January 12, 1976.
As Amended February 9, 1976.
*44 Samuel Komoroff, New York City, for plaintiff.
Konheim & Halpern, New York City, for defendant Merrill Lynch, Pierce, Fenner & Smith, Inc.
Hart & Hume, New York City, for defendant Royal Nat. Bank of New York.

OPINION
WERKER, District Judge.
This is an action to recover damages for the conversion of certain United States Treasury Notes arising under the following circumstances.
On May 15, 1966, W. E. Hutton & Company (Hutton) had in its possession the Treasury Notes which are the subject of this action in a vault room in the Bankers Trust Company at 14 Wall Street, New York, New York. Late in August 1966 when the *45 cashier of Hutton conducted an in-house audit it was discovered that these Treasury Notes were missing. Thereafter Hutton made a physical search of the vault in order to assure itself that the notes had not been misplaced. As early as September 24, 1966 James Barbi, a partner in Hutton, learned of the missing notes.
United States Fidelity and Guaranty Company (USF&G) was formally notified by Hutton of the loss by letter dated September 28, 1966 to its agent William H. Kreidler Agency which contained a list of the numbers and values of the notes. This letter was written from the Cincinnati office of Hutton by its assistant operations officer, Thomas A. Rockafeller, who obtained the information by Telex from the New York office. The only record which Hutton had of the numbers of the Treasury Notes was a handwritten list of certificate numbers prepared in May 1966 by the Clerk who clipped the coupons from the Treasury Notes. That list was never produced. The list was essential because it was the beginning point from which Hutton then reviewed its records of Treasury Note transactions from May 15, 1966 to September 1966 to determine which certificates were delivered and received in order to determine which certificates should have been in the vault. The fact that Hutton was required to go through this process in order to determine what securities it had on hand indicates that its system was, to say the least, casual and careless and hardly a secure system. The activity in Treasury Notes was then minimal and the process was not as laborious as it might seem. Those records which were used for this process were never produced although those and the original list were requested by defendants. The records should have been in existence at least until 1974.
There were no safeguards built into Hutton's method of investigation to safeguard against a clerk's error in reviewing the records for purposes of identifying the missing certificates. It is apparent that at least one such error did occur with respect to Treasury Note 31606 in the amount of $5000 which had been received by the Federal Reserve Bank of New York on denominational exchange from Hutton on May 27, 1966.
Although Hutton knew these were bearer securities the title to which passes by delivery they did not report the loss to anyone other than USF&G until November 2, 1966. On that date, at the urging of James E. Bills, USF&G's claims examiner, the loss was reported to the Federal Bureau of Investigation and the police. This failure was deliberate in order to avoid the bad publicity which might result if the loss was reported.
As long as Hutton did not report the loss to the FBI or police any inquiry as to the notes would have been fruitless. It should be noticed that USF&G although it was informed of the loss made no report to any authority either.
USF&G paid the claim of Hutton under the insurance policy and is here as the assignee of Hutton.
This action was commenced on May 22, 1968. The complaint alleges that the Treasury Notes which Hutton found to be missing were stolen sometime between May 16, 1966 and August 5, 1966. Some of those notes were presented for sale at the 149th Street branch of defendant Royal National Bank (Royal) by one Frank Mazzochi, Jr. (Mazzochi). In accordance with Mazzochi's request Royal sold the notes to defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) and deposited the proceeds into a personal checking account of Mazzochi which he had opened for that purpose and from which he withdrew the proceeds in cash. The basis for liability is that neither Royal nor Merrill Lynch negotiated the Treasury Notes in good faith or observed reasonable commercial standards so as to gain the exemption from liability contained in § 8-318 of the Uniform Commercial Code. Further with respect to Merrill Lynch it is alleged that it violated Rule 405 of the New York Stock Exchange Rules. This is the so called "know your customer rule" which requires investigation to identify *46 the customer before negotiating securities.
The defendant Royal admits in its answer that it sold certain Treasury Notes for Mr. Mazzochi and deposited the proceeds into his personal checking account from which he subsequently withdrew them. Royal sets up as an affirmative defense § 8-318 of the Uniform Commercial Code. At the trial Royal moved to amend its answer to include defenses of estoppel, failure to mitigate damages and contributory negligence. That motion is granted since in the opinion of the court all of the parties were aware of the facts in this case and neither the plaintiff nor the codefendant Merrill Lynch are prejudiced by these affirmative defenses.
Merrill Lynch admits that it purchased certain Treasury Notes from Royal, but denies any liability to USF&G. Its answer also contains a cross claim against Royal based upon a breach of warranty which Royal has denied in its answer to the cross claim.
This case was tried without a jury on August 6, 7, 8 and 11, 1975. Six witnesses appeared in open court. The parties stipulated that the pretrial depositions of 15 others would be submitted to the court. The last papers were received on December 11, 1975.
On August 4, 1966 Frank Mazzochi, Jr. came into the 149th Street branch of Royal and approached Rudolph Santoro, one of Royal's employees, for the purpose of selling a $10,000 United States Treasury Note. Santoro was then acting head of the loan department at that branch. Mazzochi identified himself as an officer of the Mutual Credit Union (Mutual). Mutual had been a customer of the bank since around 1950. Its members and officers were customers of the bank and some of its officers had previously in 1965 identified Mazzochi as the new president of Mutual. Mutual was also a frequent borrower at the bank. Mazzochi thus came to the bank upon good recommendation. He was well dressed and presented a neat and gentlemanly appearance.
Santoro's responsibilities at this time were clerical in nature. He did not make decisions or judgments and was not an officer. When Mazzochi told him of the nature of the transaction it was the first such transaction Santoro had handled as acting head of the loan department. He gave Mazzochi a receipt for the note dated August 4, 1966, and Mazzochi gave him an authorization to sell the note which stated:
"I hereby authorize Royal National Bank to sell for me one (1) $10,000 U.S. Treasury Note # 112255Due November 15, 1970 SAC 11/15/66."
Santoro retained the United States Treasury Note and sent Mr. Mazzochi to one of the officers for approval of the sale.
Mr. Mazzochi saw Mr. Robert Kayner a credit officer of Royal with full authority to approve a sale of Treasury Notes. He had met Mazzochi about a year before and knew Mazzochi to be an officer of Mutual and as a person who had accounts in the bank in connection with a contracting business. Kayner recalled that he spoke to Mazzochi only with respect to the first sale, although he acknowledged that the bank's records showed that he had approved two subsequent sales of Treasury Notes for Mazzochi.
According to Kayner, during that first conversation, Mazzochi stated that he was selling the Treasury Note for his family. He approved the sale of the note because he had no reason to believe Mazzochi was not telling the truth or did not have the right to sell the note. The approval was verbal at that time.
Santoro routinely called the Federal Reserve Bank in New York to inquire whether the note had been reported missing or stolen. After receiving a negative response he called Merrill Lynch and placed the order for the sale. Merrill Lynch's confirmation shows the date of trade as August 5, 1966 but Santoro claims he made the sale on August 4, 1966 and physically delivered the certificate on August 5, 1966. There were no instructions to the effect that Santoro was to call the Federal Reserve and, so far as can be determined, Federal Reserve maintained no official list of missing or *47 stolen securities. The only official list of missing or stolen securities was maintained in the Treasury Department, Bureau of the Public Debt. It is the policy of the Treasury Department that these securities pass freely without undue restriction.
After the sale on August 4, 1966 Santoro prepared a confirmation slip dated August 5, 1966 which Kayner signed to signify his approval.
On August 5, 1966 Mazzochi presented seven Treasury Notes aggregating $60,000.00 for sale. Santoro followed the same procedure with these notes as is set forth above as did Kayner. These were sold for $60,092.93 bringing the total sales to $70,108.42.
The second sale was completed on August 5, 1966.
Mazzochi had requested that the proceeds be paid to him by bank check but instead at Royal's request he opened a personal checking account to which the proceeds of sale were credited on August 9, 1966.
A third sale involving $70,000 in Treasury Notes took place on August 9, 1966. The proceeds of sale amounting to $70,083.70 were credited to Mazzochi's account on August 10, 1966. The balance in his account that day amounted to $140,192.12. Mazzochi withdrew the proceeds of sale in cash. On August 9, 1966 he withdrew $35,000, on August 10 he withdrew $13,000, and then $10,000 on every business day between August 12 and August 23 with a final withdrawal of $10,000 on August 29, 1966. The balance left in the account after the withdrawal on August 29, 1966 was $2,192.12. On September 2, and 23, 1966 he withdrew $500.00 and $1687.00 respectively in cash.
On September 12, 1966 Mazzochi again came to Santoro with 12 Treasury Notes aggregating $72,000. More than a month had elapsed from the time of the first three sales and Royal had heard nothing which would indicate to it that there was any question about those sales. By this time Kayner had left the 149th Street branch. As a consequence Santoro referred Mazzochi to Edward I. McGraw another officer of Royal for approval of the sale. Santoro informed McGraw of the prior sales and this sale was approved by McGraw. The same procedure was then followed by Santoro and McGraw. The 12 bonds were sold on September 12, 1966 for $71,698.70. McGraw had known Mazzochi for almost two years in September 1966 and was on a first name basis with him. McGraw discussed the transactions with Mazzochi and asked him if the notes were his to which Mazzochi replied that they were. McGraw unfortunately died during the pendency of this action and consequently only his pretrial deposition was available to the court.
On each of the delivery tickets which were prepared by Santoro there was endorsed in a conspicuous place "For the Account of: Frank Mazzochi, Jr."
The delivery tickets for the first, second and third sales were addressed to "Merrill Lynch Pierce Fenner & Smith, 70 Pine Street New York City." The delivery ticket for the fourth sale was addressed to "Merrill Lynch Pierce Fenner & Smith c/o Manufacturers Hanover Trust Co. 40 Wall Street New York City." Each of the checks for the proceeds of sale were made payable to Royal's order alone.
When the proceeds of the fourth sale were received by Royal, McGraw ordered them to be held in a suspense account. He then spoke to Mr. Irving Stolz, attorney for Royal, and sent a memorandum to Mr. Peter Walter, the Cashier at Royal's main office, asking both how he should proceed. This was done on September 19, 1966. By letter dated September 21, 1966 and his memorandum endorsed thereon Mr. Stolz was able to reconstruct these dates but he had no independent recollection of them. Stolz advised McGraw to get an affidavit from Mazzochi asserting ownership of the Treasury Notes. This was done on September 20, 1966 in McGraw's presence with respect to all the Treasury Notes sold for Mazzochi's account in September and August 1966.
Stolz, after he received Mazzochi's affidavit which was enclosed with McGraw's letter *48 of September 21, 1966, called a Mr. Wallace Nathan who was counsel to the Deputy Comptroller of the Currency and Peter Walter called the FBI and the Secret Service. No report that the Treasury Notes were stolen or missing was received from any of these sources. In the meantime Mazzochi retained an attorney, Mr. Leonard Yoswein, to represent him in connection with getting the proceeds of the fourth sale released. Mazzochi came into the bank every day to find out what was happening. Yoswein demanded the funds on the ground that Royal had no legal right to retain them, but was put off on the ground that the Treasury Notes were being checked through various government agencies.
This investigation was apparently concluded on September 29, 1966 for on that day the proceeds of sale were credited to Mazzochi's personal checking account. The banks records indicate that on September 30, 1966, a Friday, Mazzochi withdrew $10,000 and on October 3, 1966, the following Monday, he withdrew an additional $61,000 both in cash. All of the checks drawn to cash by Mazzochi were presented to Royals 149th Street branch and paid in cash. All of these services were rendered to Mazzochi by Royal without compensation.
On September 21, 1966 a report was made to the Federal Reserve Bank of New York as required by Federal regulations of these unusual cash transactions by Mazzochi as follows:
"Within a period of twenty (20) days this money was withdrawn from account in twelve (12) cash transactions."
Mazzochi, before the Treasury Notes transactions, was known to the bank not only through his Mutual connection, but also through a partnership account and a corporate account. None of these accounts involved amounts of money of the magnitude which the Treasury Note transactions did. The accounts did not, on the other hand cause any problems for the bank. Mazzochi had also been approved by the State Banking Department in his capacity as president of Mutual.
Of the 26 notes involved in the Mazzochi transactions I find that Hutton had an immediate right to possession to 24 of those notes. I am excluding notes 31606 and 2214 for the reason that the former was surrendered for denominational change and the latter does not appear to be one of the notes which was possessed by Hutton at the material time. It is true that one note number 2114 was negotiated and if the Telex transmitted list was the only list upon which that appeared an inference could be drawn that there was an error in transmission to Cincinnati but in this case there is also an affidavit made by one Rudolph Galli in New York which also claims that note to be missing as a result of the routine audit conducted in August 1966. Each of these notes were in the amount of Five Thousand Dollars; therefore, plaintiff's original claim is reduced by that amount.
With respect to the documentation as to how the certificate numbers of the notes were arrived at by Hutton defendants had a right to obtain an order precluding any proof with respect to those facts before the trial. They did not do so and must now be bound by the testimony of Mr. Rockafeller which the Court found entirely creditable. It is not necessary that a person be the owner of a chattel to bring an action in conversion. The essential is that the person who claims conversion has a right to immediate possession.
I am of the opinion that the case of Gutekunst v. Continental Insurance Company, 486 F.2d 194 (2d Cir. 1973) controls the decision in this case. It was there held that a bank which failed to investigate a borrower or his right to negotiate bearer bonds which the bank had accepted as collateral for a loan did not constitute bad faith and preclude the bank from enjoying the status of a bona fide purchaser even though the bonds were stolen.
The New York law is clear that only actual knowledge or disregard of suspicious circumstances may constitute evidence of bad faith. Gramatan National Bank & Trust Co. v. Mikolajczak, 142 N.Y.S.2d 564 *49 (Sup.Ct. Monroe Cnty, 1955) "Negligence is not enough, bad faith must exist." Coopersmith v. Maunz, 227 App.Div. 119, 237 N.Y.S. 1 (4th Dept. 1929). The codification of this principle in the Uniform Commercial Code §§ 8-3018-304(3) is undoubted. The principles enunciated also form the basis for Royal's claim that it is not liable under § 8-318 because it acted in good faith as agent for Mazzochi. Under the facts which I have stated at length and the New York law, I find that the defendant, Royal as agent, acted in good faith and observed reasonable commercial standards as is required by § 8-318. The testimony of plaintiff's expert on reasonable commercial standards, Mr. Sixt, has been largely discounted for the reason that in this court's opinion he appeared to be biased. The net of his opinion was that those standards required Royal to refuse to deal with Mazzochi. In the light of Mazzochi's relationship to the bank for over a year I do not regard the circumstances sufficiently suspicious to cause the bank concern. This is especially true when considered in relation to the circumstances in Gutekunst where the negotiator had no relationship to the bank and was in fact a stranger to it.
Merrill Lynch which ultimately became the purchaser of these Treasury Notes did not know Mazzochi. Insofar as it was concerned it had, in my opinion, the right to rely upon Royal which was its customer and became a bona fide purchaser under § 8-304(3). It had no obligation to by-pass Royal and inquire independently as to who Mazzochi was. If it had inquired of Royal it undoubtedly would have been informed of his contacts with the bank as a customer. I conclude therefore that Merrill Lynch did not violate Rule 405 of the N.Y. Stock Exchange Rules.
The case of Hartford Accident & Indemnity Co. v. Walston & Co., 21 N.Y.2d 219, 287 N.Y.S.2d 58, 234 N.E.2d 230 (1967) which plaintiff claims to have decided the precise issue is inapposite.
Inquiry elsewhere either by Royal or Merrill Lynch would have proven fruitless because Hutton did not report the loss until long after the transactions had been completed and the funds withdrawn. Furthermore, Hutton's actions after the securities were found to be missing were slothful to say the least.
Finally the principle of Bunge Corp. v. Manufacturers Hanover Trust Co., 31 N.Y.2d 223, 335 N.Y.S.2d 412, 286 N.E.2d 903 (1972) is applicable to this case. That case stands for the principle that as between two innocent victims the one who has permitted the wrong to occur must bear the loss. While the fact situation is different because in that case plaintiff's faithless employee caused the loss through fraud, here Hutton took a business decision not to report the loss and only did so under the urging of plaintiff's employee. The loss was caused by the failure of Hutton to properly maintain an inventory to insure the security of the notes in its possession and its further failure to promptly report the loss. If it had reported the loss even on September 24, 1966 it might well have avoided a part of the loss. Even the plaintiff knew of the loss on September 27, 1966 and yet permitted Hutton to maintain its silence until November. The account of Mazzochi was released on September 29, 1966.
I therefore find that as between plaintiff and its assignor and the defendants here plaintiff must bear the loss. The complaint is dismissed. Judgment for the defendants Royal and Merrill Lynch.
So ordered.