556 F.2d 676
 Dr. David SIROTA, Frances Naison, Ida Sirota and John P.
Lycette, Jr., Plaintiffs,
v.
ECONO-CAR INTERNATIONAL, INC., Westinghouse Electric
Corporation, James W. Crowley, Berrien H. Becks, and Berrien
H. Becks, William Frank O'Rourke, and Florida Bank and Trust
Company at Daytona Beach, as Executors of the Estate of Guy
B. Odum, Defendants.
James W. CROWLEY and Berrien H. Becks, Third-Party Plaintiffs,
v.
POWELL, GOLDSTEIN, FRAZER & MURPHY, a partnership,
Third-Party Defendant.
ABRAHAM & CO., INC., Claimant-Appellant,
v.
SPINGARN & CO., INC. and Satnick-Japha, Inc., Claimants-Appellees.
 No. 1106, Docket 76-7492.
 United States Court of Appeals,
Second Circuit.
 Argued May 9, 1977.
Decided June 6, 1977.
 
 Elias Rosenzweig, New York City (Harvey J. Ishofsky, Brauner, Baron, Rosenzweig, Kligler & Sparber, New York City, of counsel), for claimant-appellant.
 Jane F. Greenman, New York City (John W. Herz, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, of counsel), for claimants-appellees.
 Before KAUFMAN, Chief Judge, CLARK, Associate Justice* and JAMESON, District Judge.**
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 In this case, the respective rights of rival claimants to participate in a fund created by settlement of a securities class action depends upon who owned certain securities on a specific day, November 2, 1971. A careful analysis of the complex dealings between the parties has convinced us that the appellees, Spingarn & Co. and Satnick-Japha, Inc., were, on that day, the beneficial owners of the Westinghouse Electric Interim Certificates at issue here. Accordingly, we affirm the order of the district court, upholding the appellees' claim to share in the fund.
 
 I.
 
 2
 A brief summary of the essential facts will facilitate understanding of the legal issue presented to us.
 
 
 3
 In the autumn of 1970, a stock-for-stock merger was negotiated between two of the nation's lesser known rental car companies: Americar and Westcar.[1] Since Westcar was a wholly owned subsidiary of Westinghouse Electric Co., Americar shareholders received Westinghouse stock. A portion, however, of the consideration to be paid to the Americar shareholders was placed into escrow for one year[2] to secure Westinghouse against certain contingent liabilities. The Americar shareholders received, in lieu of the reserved stock, Interim Certificates evidencing the right to receive Westinghouse shares upon termination of the escrow.
 
 
 4
 On October 9, 1970, Americar sent a proxy statement to its stockholders, announcing a special meeting to consider the merger and detailing the terms of the merger agreement. Years later it would be alleged that this proxy statement inadequately disclosed the reasons for the escrow arrangement and the likelihood that a claim would be made against the fund. But in the halcyon autumn of 1970, this discontent lay far in the future. On October 20, the Americar-Westcar merger was overwhelmingly approved, to be consummated ten days later. The escrow period ran until October 31, 1971.
 
 
 5
 Abraham & Co., a securities dealer and owner of Americar stock, received Interim Certificates under the merger agreement. Abraham evidently regarded them a promising investment, since it bought additional Certificates during the course of 1971 on the flourishing secondary market. By the eve of the expiration of the escrow agreement, Abraham had become the owner of 606 Interim Certificates.
 
 
 6
 Abraham's hopes of turning a profit on its investment were dashed on Friday afternoon, October 29, 1971, when Westinghouse asserted claims against the escrow that exceeded its value. The news of this action, which rendered the Interim Certificates worthless, spread slowly. It is possible, therefore, that Abraham was ignorant of this event when it determined, early Monday morning, November 1, to dispose of its entire holding of Interim certificates.
 
 
 7
 Quickly upon receipt of Abraham's instructions, its agent, Brukenfeld, Mitchell & Co., telephoned two other securities dealers, the appellees, and sold the Certificates at a price of $65. Spingarn & Co. bought 200; Satnick-Japha, Inc., took the remaining 406. The aggregate selling price was $39,390. This transaction, hastily concluded, was no less speedily disavowed: within the hour Spingarn and Satnick discovered the worthlessness of the Interim Certificates and called Brukenfeld to extricate themselves from the contract. Brukenfeld was accused of concealing the Westinghouse claim against the escrow and of misrepresenting its reasons for the sale.
 
 
 8
 Brukenfeld declined to regard these telephone calls as effecting a valid cancellation of the contract of sale. Accordingly, when it failed to receive confirmation notices from Spingarn and Satnick, Brukenfeld delivered "Don't Know Notices" (NASD Form 101) to the buyers, who returned them with the notation "Don't Know". This procedure would have permitted Brukenfeld and its principal, Abraham, to repudiate the transaction if they wished, without fear of future liability in the event the buyers subsequently sought to enforce the agreement. See NASD Uniform Practice Code § 9(c)(3). Abraham, however, had absolutely no interest in undoing the contract; since no market for the Interim Certificates survived, Abraham's only chance of avoiding serious losses was to insist on its agreement and extract payment from Spingarn and Satnick.
 
 
 9
 On November 8, therefore, Brukenfeld, by letter from its attorneys, advised Spingarn and Satnick of its intention to deliver the Certificates the following day. The letter affirmed the "sale concluded November 1" and announced that Brukenfeld had been informed by counsel that the buyers' refusal to honor the transaction was "unjustified in both fact and law." Notwithstanding this warning, Spingarn and Satnick rejected tender.
 
 
 10
 Abraham & Co. promptly commenced arbitration proceedings to enforce its contractual rights. It vigorously maintained that a sale had taken place on November 1. By rejecting delivery, Abraham asserted, the appellees had "arbitrarily and capriciously breached (their) contractual commitment". Accordingly, Abraham sought "redress . . . in the amount of the sale price. . . ."
 
 
 11
 This claim was finally settled in February, 1973. Under the terms of the stipulation of settlement, Satnick and Spingarn paid to Abraham $12,739.08 and $6,260.92, respectively, "in full settlement of Abraham's claim in arbitration." Abraham, in turn, was required to "deliver . . . 1,212 Westinghouse Electric Interim Certificates . . . owned by it (after a 2 for 1 split) and which are the subject of the claims agreed to be settled . . .." According to the affidavit of Stuart Sindell, Abraham's President at the time of the settlement negotiations:
 
 
 12
 . . . Satnick and Spingarn requested that at the same time the Certificates be assigned to them, to which Abraham agreed. At no time during the negotiation of the Settlement did Satnick, Spingarn or their counsel state any intention or desire that Abraham assign title to the Certificates retroactive to November 1, 1971.
 
 
 13
 Another event was unfolding, however, which would ultimately lead to this litigation. When Abraham, Spingarn, and Satnick settled their dispute, they were unaware that a class action had been filed against Westinghouse alleging that the proxy statement issued in connection with the Americar-Westcar merger did not adequately disclose the circumstances under which Westinghouse could lay claim to the escrow. Notice was not sent to the class until February, 1974, nearly a year after the arbitration settlement.
 
 
 14
 In the spring of 1975, the class action was settled. Class definition, however, posed a problem. Since some sales of Interim Certificate were transacted on November, 1971, it was inappropriate to use ownership of the Certificates on October 29, when Westinghouse made its claim against the escrow, to define the plaintiff class. Logic required that those who had received full value for their Certificates, in sales occurring after Westinghouse asserted its claim, should be excluded, while those who paid full value, unaware that the Certificates had become worthless, should be included in the class. Accordingly, it was decided that owners of Interim Certificates as of November 2, 1971, should have the right to share in the settlement fund.
 
 
 15
 Abraham approached Satnick and Spingarn with the proposal that this unexpected good fortune should be shared. Satnick and Spingarn refused Abraham's request, and their claims to the fund were approved by Westinghouse and upheld by the district court.
 
 II.
 
 16
 It is unfortunate that we can derive but scant guidance from the class definition in resolving the dispute before us. Underlying the delimitation of the plaintiff class was the assumption that all the losses engendered by Westinghouse's claim against the escrow were absorbed by those who held Interim Certificates on November 2, 1971, when Westinghouse's claim became universally known and the market for Interim Certificates evaporated. Under the circumstances presented here, however, the total loss was distributed between the appellant and the appellees, in accordance with the arbitration settlement. Consequently, Abraham, Spingarn and Satnick are all to a greater or lesser extent "deserving" within the logic of the class definition.
 
 
 17
 Abraham is thus able to argue that it suffered a loss with respect to the Certificates that the class action was brought to redress. This fact is scarcely subject to question; yet it does not materially aid the resolution of this dispute. Spingarn and Satnick, after all, also suffered injury. The problem presented to the district judge, and now to us, is how to choose between these rival claimants to the class action settlement fund. Sadly, someone is fated to endure his misfortune.
 
 III.
 
 18
 The cardinal issue in this case is, "who was the beneficial owner of the Interim Certificates on November 2, 1971?" We are convinced that a contract of sale was duly concluded November 1, 1971. This contract was never rescinded or voided. We view the transfer of the Certificates from Abraham to Spingarn and Satnick, pursuant to the arbitration settlement, as a consummation of the sale contracted for on November 1. To be sure, the arbitration settlement does not in terms transfer "ownership" in the Certificates as of a prior date. But the delivery of the Certificates to the buyers would have been senseless, unless the parties intended Spingarn and Satnick to have the benefit of the litigation value the Certificates represented. Except as evidence of the buyer's beneficial ownership from the moment of sale on November 1, 1971, the Certificates did not have and could not acquire any value at all.
 
 
 19
 Abraham questions whether any contract was concluded on November 1. It observes that the buyers failed to confirm the sale, and, indeed, returned the NASD 101 Forms marked "Don't Know". But, we do not believe it can be seriously contended that the appellees' actions voided the agreement. Of course, under § 9(c) of the Uniform Practice Code, Abraham could have repudiated the "D.K."d contract without fear of liability. But Abraham did not do so; rather it affirmed the agreement, by tendering the Certificates and by commencing arbitration proceedings. Accordingly, § 9(c), on which Abraham relies so heavily, is simply irrelevant to this case. The contract of sale was never canceled, because Abraham never consented to the cancellation.
 
 
 20
 Perhaps in recognition of this, Abraham explicitly conceded at oral argument that it has never regarded the November 1 contract a nullity. Abraham asserts, rather, that the arbitration proceeding it initiated, which appears to be an action for the price of the Certificates, might be interpreted as an action for damages. The confusion, Abraham maintains, flows from the unfortunate fact that the Certificates seemed, at the time, completely worthless, so that damages equaled the price. The appellees, in contrast, urge that Abraham's action was governed by the New York U.C.C., § 8-107(2):[3]
 
 
 21
 (2) Where, pursuant to a contract to sell or a sale a security has been delivered or tendered to the purchaser, and the purchaser wrongfully fails to pay for the security according to the terms of the contract or the sale, the seller may as an alternative to any other remedy recover the agreed price of the security. . . .
 
 
 22
 These different theories lead to different interpretations of the arbitration settlement. Abraham is forced to argue that the settlement involved calculation of damages and a separate sale of the Interim Certificates to Spingarn and Satnick. The appellees, on the other hand, maintain that the arbitration agreement merely executed the prior sale. According to this view, Spingarn and Satnick were beneficial owners of the Certificates from November 1, 1971, and consequently have a right to participate in the class action settlement fund.
 
 
 23
 In choosing between these two positions, we cannot, even in principle, do more than guess at the inchoate intentions of the parties. But, since Abraham's view requires us to imagine that a senseless sale of valueless securities took place in February, 1973, the position maintained by Spingarn and Satnick must be preferred.[4]
 
 
 24
 Accordingly, we regard the arbitration agreement as providing for the consummation of the prior sale of the Interim Certificates to Spingarn and Satnick, since this interpretation alone fully accounts for the actions of the parties. Since beneficial ownership passes when the contract of sale is concluded, see Broderick v. Alexander, 268 N.Y. 306, 197 N.E. 291 (1935); Tangorra v. Hagan Investing Corp., 38 A.D.2d 671, 327 N.Y.S.2d 131 (4th Dept. 1971), we conclude that Spingarn and Satnick were the beneficial owners of the Interim Shares at all times after November 1, 1971.
 
 IV.
 
 25
 Abraham asserts that, under New York law, a settlement agreement cancels all prior contracts dealing with the same matter. Putnam v. Otsego Mutual Fire Ins. Co., 45 A.D.2d 556, 360 N.Y.S.2d 331 (3d Dept. 1974). This rule certainly holds with regard to the terms of the prior agreement. But it affords Abraham small comfort here, where the only reasonable interpretation of the arbitration agreement is that it requires the parties to consummate a past sale. Thus, the settlement itself refers back to the transaction of November 1.
 
 
 26
 Moreover, we do not believe the arbitration settlement expresses the intention to treat the original transaction as if it had never existed, even though its actual terms might not survive the new contract. The question presented here falls outside the holding of those cases treating a settlement as a novation that supersedes the preceding contract. See Gaffey v. St. Paul Fire & Marine Ins. Co., 221 N.Y. 113, 116 N.E. 778 (1917); 6 Corbin on Contracts § 1293 at 189-90 (1962). Here we are not dealing with the terms of a contract, but with the time at which beneficial ownership passed to the buyers. As long as the seller maintains an action for the price, both the risk of depreciation and the chances of appreciation and income from the securities falls to the defaulting buyer. It would not be reasonable to interpret a settlement transferring the securities that was silent on this point as reassigning these contingencies to the seller.
 
 
 
 *
 Tom C. Clark, Associate Justice, United States Supreme Court, Retired, sitting by designation
 
 
 **
 William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 Westcar subsequently changed its name to EconoCar International
 
 
 [2]
 Sixteen per cent of the Westinghouse shares to be paid to Americar stockholders were placed in the escrow account
 
 
 [3]
 Abraham suggests that the Uniform Commercial Code should not apply to dealings among members of the National Association of Securities Dealers. But we do not regard either the "sell-out" provisions of the Uniform Practice Code § 60 or the "don't know" provision of § 9 as exhausting a broker's remedies for breach of contract, particularly where there is no market for the securities involved in the ill-fated transaction. Nor, indeed, did Abraham itself regard the damage remedies of the Uniform Practice Code as exclusive, since it did not ground its claim in arbitration on any particular remedial provisions of the NASD code
 
 
 [4]
 This position is supported by Abraham's assertion, both in its arbitration complaint and in its proof of claim in these proceedings, that it "sold" the Interim Certificates on November 1. Nor, despite Abraham's contrary contention, does the language of the arbitration settlement, which refers to the Certificates as "owned by Abraham," compel contrary result. This ambiguous phrase does not necessarily signify that Abraham owned the certificates as of the date of writing, in February 1973; indeed it appears far more plausible that the agreement merely referred to Abraham's past ownership before the sale in 1971. The purposes of this language were only to specify which Certificates Abraham was obligating itself to deliver and, conceivably, to assure that Abraham was capable of conveying valid title to the securities
 We do not, of course, attach decisive significance to Mr. Sindell's affidavit, submitted with this litigation in view. The issue before us is not whether Abraham made a "retroactive" assignment of the Interim Certificates. If, as we believe, Abraham's resort to arbitration was equivalent to an action for the price, the settlement merely consummated the prior agreement. Since this appears the only plausible interpretation of the settlement, the absence of explicit discussion on the matter seems of small importance.