SAMSON BRENER AND ANOTHER v. INDUSTRIAL STEEL CONTAINER COMPANY AND OTHERS. JACK BURSHTEIN AND ANOTHER, APPELLANTS.

228 N. W. 2d 115.

March 14, 1975—No. 44883.

*Oppenheimer, Wolff, Foster, Shepard & Donnelly, Thomas P. Kane,* and *William P. Studer,* for appellants.

*Ruttenberg, Orren, Griswold & Norton, Royal C. Orren,* and *Lee A. Bernet,* for respondents.

Heard before Todd, MacLaughlin, and Knutson, JJ., and considered and decided by the court en banc.

MACLAUGHLIN, JUSTICE.

This is a dispute over the interpretation of a contract. Defendants Jack Burshtein and Frank J. Burshtein appeal from a judgment entered in favor of plaintiffs, Samson Brener and Hymen Simes. We affirm.

In 1952, Industrial Steel Container Company (hereafter referred to as the corporation) was incorporated as a Minnesota corporation. Three thousand shares of stock were ultimately issued by the corporation. Sta-Vis Oil Company, whose principal shareholder was George Rutman, was issued 1,500 shares; Joseph Rutman was issued 500 shares; and Israel Burshtein, Shoel Burshtein, and plaintiffs Samson Brener and Hymen Simes were each issued 250 shares.

On February 6, 1952, after the incorporation of Industrial, a buy-sell agreement was executed by all of these shareholders. The buy-sell agreement divided the shareholders into three units:

"a. The owners at any time of the stock presently owned by Sta-Vis Oil Company shall be known as Unit No. 1.

"b. The owners at any time of the stock presently owned by Joseph Rutman shall be known as Unit No. 2.

"c. The owners at any time of the stock presently owned by Samson Brener, Hymen Simes, Israel Burshtein, and Shoel Burshtein shall be known as Unit No. 3."

The agreement contained provisions for the disposition of stock upon the death of the shareholders. Upon the death of George Rutman, the stock owned by Unit 1 would be offered for

sale to the members of Units 2 and 3 proportionately in accordance with their then existing stock ownership. If Units 2 and 3 together refused to purchase the stock, each had the option of purchasing it. If the members of Units 2 and 3 did not purchase the stock, Sta-Vis Oil could purchase it. If Sta-Vis did not purchase the stock, the corporation could purchase it and if the corporation failed to purchase, the holders of the stock could retain it, sell it to other buyers, or force liquidation of the corporation.

At the death of Joseph Rutman, the stock owned by Unit 2 would be offered to the members of Unit 3, and if they chose not to purchase, it was to be offered to Unit 1. If both Units 1 and 3 failed to purchase, the agreement provided that the corporation could purchase the stock; and if the corporation did not purchase the stock, it could be sold to other buyers or the corporation could be forced into liquidation.

The agreement further provided that "[a]t the death of one or more of the members of Unit No. 3," the stock was to be offered to the surviving member or members of Unit 3 proportionately. If one or more of these members refused to purchase the stock, it was to be sold to "the remaining survivor or survivors of Unit 3." The agreement went on to provide that if those members failed to purchase the stock, it would be offered to members of Unit 2, then to Unit 1, and finally to the corporation and to other buyers or the corporation could be forced into liquidation.

In addition to the foregoing provisions providing priorities for the purchase of stock upon death, the agreement contained two other provisions concerning transfer of the stock. Paragraph 5 provided that if an owner of the stock of the corporation "wishes to sell said stock, such stock shall be offered for sale in the same order and in accordance with the same provisions for disposition of stock on death." Paragraph 7, a significant provision for purposes of the issue in this case, permits lifetime "transfer" of stock, notwithstanding the provisions of Paragraph 5, by an owner to other members of his own unit, or to his

or her parents, children, brothers, sisters, wife or husband, or in trust for the benefit of himself or such relatives.

Israel Burshtein, a member of Unit 3, died in 1961. In 1968, Shoel Burshtein, another member of Unit 3, acquired Israel Burshtein's shares, apparently pursuant to the 1952 agreement. After the transfer, Shoel was the owner of 500 shares of the company stock. On September 19, 1970, Shoel Burshtein died. Plaintiffs Hymen Simes and Samson Brener, as members of Unit 3, made a demand on defendants Frank and Jack Burshtein, as executors of their father's estate, that the 500 shares of stock be sold to them in accordance with the terms of the 1952 agreement. In response to this demand, defendants informed plaintiffs that Shoel Burshtein was not the owner of the shares in question on the date of his death and refused to transfer the stock certificates. Their refusal was based on their claim that on March 5, 1968, in Winnipeg, Canada, their father, Shoel Burshtein, sold each of them 250 shares of the stock. Payment was made in the form of two demand notes, payable to Shoel Burshtein and executed by Frank and Jack Burshtein respectively. The total amount of the two notes was $15,000.

The alleged sales of March 5, 1968, were evidenced by two written agreements. However, the two stock certificates representing the 500 shares were never endorsed by Shoel Burshtein; the ownership of the stock was never changed on the record books of the corporation; and none of the shareholders of the corporation or signatories of the 1952 agreement was informed of the transfer prior to plaintiffs' demand. Instead, on the day of the sales, the two certificates were delivered by Shoel Burshtein to defendants, who placed them in a vault. The vault was used by Shoel Burshtein in his business, by defendant Jack Burshtein in his business, and by defendants Jack and Frank Burshtein to store their personal papers. All three had access to the vault. Defendants testified that they removed the certificates from time to time at their discretion.

The 1952 agreement provided that any stock sold under the

death distribution schemes would be sold at its book value as of the close of the calendar month immediately preceding the death of the decedent. At trial, it was stipulated by counsel for the parties that an accountant, if he were called, would testify that the book value of the corporation on August 31, 1970, the last day of the month preceding Shoel Burshtein's death, was $360,520. Another accountant testified at trial that, based on several audits, this figure was a reasonable one. Between that date and 1972, certain of the corporation's property was condemned by the St. Paul Housing and Redevelopment Authority. This resulted in an increase in the book value of the corporation of approximately $1,000,000.

Plaintiffs brought this action to compel defendants Jack and Frank Burshtein, individually and as executors of their father's estate, to transfer the 500 shares of stock to them with the price to be determined according to the August 31, 1970, book value of the company. Plaintiffs claimed that the March 5, 1968, stock transfer was not effective and that on the date of his death Shoel Burshtein was the owner of the stock. In the alternative, plaintiffs contended that it was the intention of the parties to the 1952 agreement that, for the purposes of triggering the provisions on disposition of the stock at the death of a member of Unit 3, the term Unit 3 meant Shoel Burshtein, Israel Burshtein, Samson Brener, and Hymen Simes, the original members of that unit. Plaintiffs therefore asserted that as surviving members of Unit 3 they had the first right to purchase the stock. Defendants contended that the term Unit 3 meant "[t]he owners at any time of the stock presently owned by" the four original shareholders. Defendants argued that since there had been a valid lifetime transfer of the stock to them by Shoel Burshtein they were now members of Unit 3 and Shoel Burshtein was not a member of Unit 3 at the time of his death. For these reasons defendants argued that they could not be required to sell the stock.

The trial court, hearing the case without a jury, ordered judgment for plaintiffs and ordered defendants to transfer the shares

to plaintiffs for the sum of $60,086.50, which the court found to be one-sixth of the book value of the corporation as of August 31, 1970.

   ■   The trial court found that there had been no valid transfer of the stock from Shoel Burshtein to defendants.[1] In our judgment, the trial court erred in that determination. All that is required to effectuate a valid transfer of securities between the parties to the transfer is delivery with the intent to change ownership. Kaufman v. Diversified Industries, Inc. 460 F. 2d 1331 (2 Cir. 1972) ; McCorquodale v. Holiday, Inc. 90 Nev. 67, 518 P. 2d 1097 (1974). Minn. St. 336.8—301(1) provides that upon delivery of a security the purchaser acquires the rights in the security which his transferor had in the security. Section 336.1—201(14) defines delivery generally as the voluntary transfer of possession. Section 336.8—313(1)(a) provides specifically that delivery of securities to a purchaser occurs when the purchaser acquires possession of the security. See, 3 Anderson, Uniform Commercial Code (2 ed.) § 8-301:4.

The testimony at trial supports the conclusion that a valid transfer took place. There is no concrete evidence to the contrary. There was no testimony at trial to the effect that the March 5, 1968, meeting did not take place, and in fact the transaction itself is evidenced by two written agreements and two promissory notes. Plaintiffs do not challenge the fact that Shoel Burshtein gave defendants the stock certificates. They only claim that his actions did not constitute delivery because he did not part with possession of the certificates. Plaintiffs base this assertion on the fact that Shoel Burshtein had access to the vault where the certificates were kept after the transfer. However, this fact alone does not preclude an effective transfer between the parties to the transaction. See, Rogers v. Rogers, 271 Md. 603, 319 A. 2d

---

[1] While the parties discern some ambiguity in the findings, the following language is contained in Finding of Fact No. 8: "That Shoel Burshtein died on September 19, 1970, and at that time was the owner of 500 shares of common stock of said Company."

119 (1974). The fact of delivery is uncontradicted, and through delivery defendants acquired all the interest which their father had in the stock. Section 336.8—301(1).[2]

■ While the trial court did err in holding that a valid transfer did not take place, this error does not require reversal because we concur with the trial court's conclusion that the remaining original members of Unit 3 had the right to purchase the stock upon the death of any one of the original members despite a transfer pursuant to Paragraph 7.

Each stock certificate received by defendants contained the following language:

"The transfer of this stock is subject to restrictions contained in that certain agreement dated the sixth day of February, 1952, * * * a copy of which is on file in the office of the secretary of this corporation."

Defendants do not contest that they are subject to the terms of the 1952 agreement. However, they argue that the trial court incorrectly interpreted the agreement because, they allege, the agreement does not require them to sell the 500 shares of stock to plaintiffs. We disagree. The trial court through use of extrinsic evidence interpreted the agreement to mean that the remaining original members of Unit 3 had the right to purchase the stock upon the death of any one of the original members even though the stock in the meantime had been transferred to a relative pursuant to Paragraph 7. The trial court's memorandum reads in part as follows:

"Upon a reading of the entire contract of February 6, 1952, and in consideration of the testimony adduced during trial, the Court is of the opinion that Paragraph 7 (a and b) does not

[2] Lack of an endorsement does not affect the validity of the transfer as between the transferor and the transferee, § 336.8—307; and transfer of the stock on the corporate records is only an alternative method of delivery as compared to actual physical possession of the security. Section 336.8—313(1)(e).

supersede or abrogate the provisions of Paragraphs 2 [relating to sale of the stock upon the death of members of the three units] * * *. To find otherwise would be tantamount to permitting a close corporation to virtually become public and would have destroyed the intent of the parties to the original agreement."

The trial court allowed considerable testimony from the surviving signatories of the buy-sell agreement, and from one of the attorneys involved in the preparation of the agreement, to assist the court in its interpretation of the agreement. Defendants argue that this was error because they contend the agreement is not ambiguous. They further assert that if the agreement is interpreted as a matter of law without the aid of extrinsic evidence it must be construed contrary to the trial court's determination.

In City of Marshall v. Gregoire, 193 Minn. 188, 198, 259 N. W. 377, 381 (1935), this court said: ·

"A written contract is little more than a scrap of writing save as it operates with legal effect on matters extraneous to itself. Construction deals with the dynamic rather than the static phase of the instrument. The question is not just what words mean literally but how they are intended to operate practically on the subject matter. Thus, seemingly plain language becomes susceptible of construction, and frequently requires it, if ambiguity appears when attempt is made to operate the contract."

In attempting to trigger the operation of this agreement, an ambiguity is apparent as to the application of Paragraph 7 as it related to the issues presented to the trial court. See, Metro Office Parks Co. v. Control Data Corp. 295 Minn. 348, 205 N. W. 2d 121 (1973). In resolving this ambiguity, the trial court admitted extrinsic evidence so that it could determine how the agreement was intended to operate under the peculiar facts of this case.[3] After carefully reviewing the agreement, we hold that

[3] There was considerable testimony elicited at trial that the purpose of Paragraph 7 was to allow a transfer of stock to relatives if it would create a tax or other personal advantage to the transferor, but that

the trial court properly admitted the extrinsic evidence so that it could resolve this ambiguity and ascertain the intention of the parties to the agreement.

We affirm the trial court's determination that the buy-sell agreement was intended to protect the original members of Unit 3 so that they would have the opportunity to purchase the stock upon the death of other members of the unit. The provisions of Paragraph 7, according to the evidence, were to provide a method of transfer which could possibly be beneficial for tax or other personal purposes, but it was not intended to negate the general overall purpose of the agreement, which was to assure that the stock would be closely held even upon the death of the original shareholders. If a member of Unit 3 were permitted to transfer his stock under Paragraph 7, unencumbered by the obligation of the transferee to sell to the other members of Unit 3 on the death of the transferor, there would be no practical limit to the number of persons who could become owners and claim they were under no obligation to sell upon the death of the transferor. That result would clearly be inconsistent with the intent of the agreement, which was to restrict the stock ownership of the corporation.

■ Defendants' concluding argument is that there was insufficient foundation for the accountant's testimony that the book value of the corporation as of August 31, 1970, was $360,000. Questions regarding foundation are within the discretion of the trial court. We have examined the record and find no abuse of that discretion in admitting the accountant's testimony.

Inasmuch as we hold valid the transfer of stock by Shoel Burshtein to defendants, that stock should now be transferred by defendants to plaintiffs upon payment by plaintiffs to defendants, individually, of the purchase price of $60,086.50, the price determined by the trial court.

Affirmed.

---

upon the death of the transferor the transferees would have to sell the stock back to the remaining original members of Unit 3.