Irving MATTHYSSE, Plaintiff,

v.

SECURITIES PROCESSING SERVICES,
INC., Defendant.

No. 73 Civ. 4919.

United States District Court,
S. D. New York.

Dec. 22, 1977.

**1012**

Blum, Haimoff, Gersen, Lipson & Szabad, New York City, for plaintiff; Alan David Pekelner, New York City, of counsel.

Amend & Amend, New York City, for defendant; Edmond F. Supple, Richard L. Schmeidler, New York City, of counsel.

## OPINION

GAGLIARDI, District Judge.

This diversity action has been brought to recover approximately $44,000 in damages for the alleged conversion by the defendant of securities claimed to be the property of the plaintiff. The case was tried to the court, and the following constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

### The Facts

Plaintiff Irving Matthysse[1] is a retired engineer who in October, 1972 became a customer of Paragon Securities Company ("Paragon"), a New Jersey corporation with offices in New Jersey which was engaged in the sale and purchase of municipal bonds, for its own account, to and from the general public. During the early part of 1973

Matthysse engaged in a series of sales to and purchases from Paragon. In the course of its business Paragon dealt with the present defendant, Securities Processing Services, Inc. ("SPS"),[2] a New York corporation which functioned as a private clearing facility for municipal bond dealers. In that capacity SPS effected the actual physical transfer of the bonds sold to or by the bond dealers who, like Paragon, were its customers. The relationship between Paragon and defendant SPS, and the mechanics of the bond delivery process involving SPS, Paragon, and Paragon's customers, including plaintiff Matthysse, are crucial to the resolution of this lawsuit.

### Matthysse—Paragon Relationship

In early 1973 Matthysse completed several routine bond transactions with Paragon, on each occasion doing business with the same Paragon salesman, Andrew J. Molot. In June of 1973 plaintiff sold certain municipal bonds to Paragon for a net total of $89,768.75. Pursuant to an agreement reached between Matthysse and Molot, the proceeds from this sale were left with Paragon as a credit to be applied against future purchases by Matthysse. On July 16, 1973 Matthysse purchased from Paragon for $4,728.65 a 6% $5,000 par Lake of Egypt, Williamson Co., bond due on November 1, 1999. The bond certificate was forwarded to Matthysse in due course and his account was duly debited by Paragon, reducing his balance to $85,040.10.

Plaintiff's account remained unchanged as of July 31, 1973, on which date two important telephone conversations between Matthysse and Molot took place. In the first of these telephone calls Molot stated to Matthysse that Paragon was about to go into voluntary dissolution or liquidation. Molot explained that as a consequence no payments could be made to any of Paragon's customers for thirty to sixty days and, although Matthysse would eventually be

---

1. Matthysse was a citizen of Connecticut when the complaint was filed in this action, and at the time of the transactions involved resided in Danbury. He is presently a citizen of Massachusetts and resident of Boston.

2. SPS has since changed its name and is presently doing business as Bradford Securities, Inc.

paid the approximately $85,000 owed him, his funds would be frozen along with Paragon's for that period of time. Molot suggested that, in order to avoid the temporary hold on his funds, plaintiff consider using the balance in his account to purchase municipal bonds from Paragon immediately. Matthysse agreed to this procedure and instructed Molot to prepare a list of suitable bonds. Molot called Matthysse back later on July 31 and proposed a number of specific municipal securities which could be bought for an amount closely approximating Matthysse's credit balance. Matthysse agreed to the purchases and placed his order to buy from Paragon the following nine issues:

| Issue | Par Value | Purchase price to Matthysse |
|---|---|---|
| 1. Philadelphia S/D Pa. 3.875% 7/1/83 | $20,000 | $15,519.59 |
| 2. Barnwell Cty. S.C. IDR 7.75% 4/1/87 | 5,000 | 4,994.72 |
| 3. New York State UDC 6.375% 10/1/12 | 10,000 | 9,995.83 |
| 4. Lake of Egypt Williamson 6% 11/1/99 | 5,000 | 4,734.53 |
| 5. LaGrange Ga. IDR 12/15/80 | 5,000 | 4,931.11 |
| 6. Barnwell Cty S.C. IDR 7.750% 4/1/86 | 5,000 | 4,994.72 |
| 7. NYC 6% 11/1/85 | 15,000 | 15,339.25 |
| 8. NYC 5.2% 7/1/92 | 5,000 | 4,652.31 |
| 9. McCurtain Co. Okla. Comm. 8% 10/1/92 | 20,000 | 20,391.11 |
| | | $85,553.17 |

Matthysse expressly instructed Molot to apply the funds held for him by Paragon toward these orders.

Upon completing his second telephone conversation with Matthysse, Molot prepared handwritten order tickets covering the July 31 orders. These tickets were transmitted to Paragon's operations department, or "back-office," for the in-house processing system by which the orders were to be confirmed, confirmation notices sent to the purchaser and delivery instructions delivered to defendant SPS as clearing agent.

### Paragon—SPS Relationship

For several years SPS and Paragon had maintained a contractual relationship pursuant to which SPS functioned as Paragon's clearing agent and advanced funds to Paragon to assist in its municipal bond transactions. The written clearance services agreement which was in effect between them in the summer of 1973 was essentially identical to agreements SPS maintained with all of its customers. Pursuant to that agreement, SPS agreed to physically receive, at its New York office, the municipal bonds purchased by Paragon and to make payment to the seller for bonds so received. Conversely, on instructions from Paragon SPS would deliver bonds sold by Paragon to Paragon's customers. When effecting such a sale for Paragon SPS would either take immediate payment from Paragon, which would be received along with Paragon's instructions to deliver, or would receive payment from Paragon's buyer upon delivery of the bonds to that buyer.

The services agreement with Paragon further provided that, in the event SPS received and paid for bonds on behalf of Paragon and held those bonds for more than five days without receiving either payment or sale and delivery instructions from Paragon, SPS reserved the right to demand that Paragon deposit with SPS such percentage of the bonds' cost or market value as SPS might require. If the required payment were not deposited by Paragon within 24 hours of SPS's oral or written demand, SPS was authorized to liquidate in the open market such securities of Paragon as it held and to apply the proceeds to the balance due from Paragon.[3] The agreement with

---

**3.** The services agreement, which was drafted in the form of a letter from SPS to Paragon, provided in pertinent part:

¶ 4. On your request or during the normal course of business, we may extend to you advances payable on demand, in order to facilitate the delivery of securities contemplated by this agreement. You agree to pay interest and/or other financing fees on the daily balance of such advances at a mutually agreed rate.

To the extent that any advance is made in respect of securities which come into our possession, and to the extent that payments made upon delivery of any securities at your direction are less than our advances in re-

Paragon also authorized SPS to pledge or hypothecate the securities carried for Paragon separately or in common with its own securities without retaining for delivery purposes a like amount of the same or similar securities.

In accordance with this arrangement on or about August 1, 1973 Paragon assembled the confirmation notices of the bond purchases ordered by Matthysse over the telephone on July 31, 1973, preparing one set for Matthysse and one set for transmittal with delivery instructions to SPS. Molot mailed the computer print-out confirmation notices to plaintiff's nominee, the Fidelity Trust Company ("Fidelity") of Darien, Connecticut and plaintiff picked up his complete set of the confirmations, covering all nine issues ordered, at Fidelity on August 6, 1973.[4] On August 2, 1973 SPS received from Paragon confirmations and delivery instructions covering only the Lake of Egypt, Williamson Co., 6% ("Lake of Egypt") bond and the New York State U.D.C. 6⅞% ("New York UDC") bonds included in the Matthysse order of July 31. Upon receipt of these confirmation and delivery tickets, SPS prepared the correspond-

ing certificates for mailing. As for the New York UDC bonds, certificates numbered 16847 and 16848 were retrieved from the SPS storage vault and were physically attached to the delivery instructions form, upon which SPS personnel had written "Acc. of I. Matthysse. 16487/8 × 5M," and under "Date delivered" had entered "8/2" As for the Lake of Egypt purchase, certificate number 279 was attached to the delivery ticket, upon which was similarly recorded the bond certificate number, Matthysse's name, and the date. No delivery tickets or confirmation notices covering the seven remaining bond issues ordered by plaintiff, listed *supra,* were ever received by SPS, and consequently no delivery procedures were initiated as to them.

### Paragon Bankruptcy and Default on SPS Agreement

On July 30, 1973, the day before Molot informed Matthysse of Paragon's financial straits and Matthysse ordered the nine bond purchases, Paragon's Board of Directors unanimously adopted a resolution to commence a proceeding in New Jersey state

---

spect of such securities, you shall immediately deposit with us, upon our demand, which need not be written, funds in the amount of such advance or debit balance, as the case may be.

\* \* \* \* \* \*

¶ 8. We will not act as custodian of municipal bonds on your behalf except as described below. We will, however, initially hold such bonds for up to five days while awaiting your instructions as to delivery and for up to three days following any rejection of a delivery which you have ordered. Following the lapse of any such five-day or three-day period, you agree, upon our demand, which may be unwritten, to deposit with us within 24 hours of such demand a percentage of the total cost or market value of any such bonds held by us. Such percentage will be determined by us, at our sole discretion, and may fluctuate, from time to time, based on market conditions, quality and ratings of securities held, or other significant factors. In the event that any such bonds have not been delivered and paid for within 30 days of their receipt by us, you will within 24 hours following a demand by us which demand may be unwritten, wire to us the amount of funds demanded which shall not exceed the total cost of such bonds less any amount you have

deposited pursuant to the terms and conditions set forth in the immediately preceding sentence. In the event that the funds demanded under any terms of this agreement, related to advances made on your behalf are not received by us within the time prescribed, we reserve the right to liquidate any securities held in your account in the open market, without notice to you, the proceeds of such liquidation to be applied against the balance due in your account with us. You will remain responsible for any deficit remaining in your account after such liquidation.

\* \* \* \* \* \*

¶ 10. We agree to act promptly in response to your directions, except that we will not be responsible for delays not within our control in the receipt or delivery of municipal bonds or other documents . . .

4. Plaintiff Matthysse, who lived in a rural area, used Fidelity as a nominee to receive bonds on his behalf, in order to facilitate delivery and to ensure the availability of an authorized person to sign registered mail receipts when necessary. Matthysse regularly picked up bonds delivered to the bank from an officer and then placed them in his safe deposit box.

court seeking a voluntary dissolution of Paragon's business and the appointment of a receiver to aid in that dissolution. On August 1, 1973 Paragon filed its complaint for such relief in the Superior Court of New Jersey, Chancery Division. By order entered the same date the New Jersey Court adjudged that Paragon was insolvent within the meaning of relevant New Jersey law,[5] and enjoined Paragon, its officers or its agents from paying out or transferring any of its assets except to the court-appointed receiver. Mr. Leon Krantzhor was appointed statutory receiver.

On August 2, 1974, Mr. Larry Brown, an officer of Paragon, spoke by telephone with Mr. Michael Caggiano, then president of SPS, and informed him of Paragon's decision to file for an adjudication of insolvency and appointment of receiver. Over the course of its relationship with Paragon, SPS had extended account advances to Paragon which on August 2, 1973 totalled $2,316,-488.07. Pursuant to the terms of the SPS–Paragon agreement Caggiano immediately made an oral demand upon Brown for payment of the full amount of the outstanding balance within 24 hours. Caggiano repeated the demand for payment in full in writing on the same day, and at the same time also made the demand on Receiver Krantzhor making clear in each instance that Paragon's failure to comply would result in the liquidation by SPS of the securities it held for the Paragon account.

On August 3, 1973 Receiver Krantzhor and Mr. Brown of Paragon visited the offices of SPS and directed SPS personnel not to comply with unexecuted delivery instructions sent by Paragon regarding bond sales which Paragon had indicated were already paid for by the purchaser.[6] Included among the unexecuted delivery tickets held by SPS which were cancelled in this manner were the tickets instructing SPS to deliver to Matthysse the Lake of Egypt and New York bonds which he had ordered from Molot by telephone on July 31. As to these bonds, the only issues for which SPS ever received delivery instructions, SPS had initiated but not completed steps for physical delivery of the certificates when Paragon's delivery instructions were cancelled by Receiver Krantzhor. SPS acceded to the cancellation and did not deliver to Matthysse.

Paragon's 24 hour period within which to pay SPS the balance due on its loan, following the demand by SPS, expired Friday afternoon August 3, 1973, with no payment having been made. Following Paragon's failure to comply, SPS arranged for liquidation of the Paragon bonds SPS considered to be collateral securing the Paragon debt. These bonds included those which Matthysse had ordered purchased on July 31. Such liquidation was initiated on Monday, August 6, 1973 through defendant's broker, W. E. Hutton & Co., and Notine & Co., a dealer in municipal bonds, in a manner conceded by plaintiff to have been commercially reasonable.

On August 6, 1973 an involuntary petition in bankruptcy was filed against Paragon in the United States District Court for the District of New Jersey and on August 8 the Bankruptcy Court stayed SPS from further sale of Paragon's bonds. On August 28, 1973 Paragon was adjudicated a bankrupt and a Trustee was appointed.

Pursuant to a court-approved agreement between the Trustee and SPS, the unsold bonds which remained with SPS in Paragon accounts after the unfinished liquidation sale were transferred to accounts in the name of the Trustee, and plaintiff has agreed to pursue his claims as to all but one of those bonds in a reclamation proceeding in the bankruptcy court.[7] The bonds which

---

5. N.J.S.A. §§ 14A:14–2 *et seq.*

6. The delivery orders which SPS personnel were ordered to disregard were those which had been marked "free" by Paragon. The notation "free" on delivery instructions indicated

to SPS that SPS was not required to obtain payment from Paragon's customer upon delivery of the bond certificates to that customer.

7. The bond issues as to which plaintiff does not seek recovery before this court, are as follows:

are currently at issue in the instant suit for conversion are the following issues which SPS *did* sell in the course of its liquidation of the Paragon account bonds between August 6 and August 8, 1973:

| Par Value | Issue | Amount realized through sale Aug. 6–Aug. 8 |
|---|---|---|
| $5,000 | NYC 5.2% 7/1/92 | $4,137.68 |
| 10,000 | New York UDC 6⅝% 10/1/12 | 9,914.17 |
| 10,000 | Phila. Sch. 3⅞% 7/1/83 | 7,340.63 |
| 20,000 | McCurtain Okl. 8% 10/1/92 | 18,761.67 |
| | | $40,154.15 |

Plaintiff's claim, stated simply, is that he owned the bonds prior to SPS's liquidation of them, and that this liquidation constituted a wrongful appropriation of his property. In addition, plaintiff asserts a claim against SPS for conversion of the Lake of Egypt bond which, plaintiff concedes, was not sold by SPS but was included in the court-approved transfer to accounts in the name of the Trustee in Bankruptcy. Plaintiff claims that defendant is liable for conversion as to this particular issue because it failed to transfer the certificates to him in early August, 1973 despite having received specific delivery instructions from Paragon.

### The Law

Central to plaintiff's claim is his contention that as of July 31, 1973 he became owner of the disputed bonds when he ordered them over the telephone from Para-

gon and Paragon's agent agreed to apply plaintiff's existing credit balance toward the purchase of the bonds. The principal affirmative defense raised by defendant is its contention that plaintiff Matthysse never became a "purchaser" of the bonds he ordered from Paragon under the governing provisions of the Uniform Commercial Code ("UCC") [8] and that, since he never acquired a possessory interest in the bonds, his claims against SPS for conversion must fail. Additionally, defendant claims that it had a lien interest in the bonds superior to any interest plaintiff might have obtained from Paragon. The legal relationships involved cannot be neatly classified according to traditional terminology, *see Stock Clearing Corp., Inc. v. Weis Securities, Inc.,* 542 F.2d 840, 844 (2d Cir. 1976), and a close scrutiny of Article 8 of the UCC is required to determine the rights and liabilities of the parties.

### "Delivery" under the Uniform Commercial Code

The transfer of ownership of securities to a purchaser is governed by the concept of "delivery" in Article 8 of the UCC, "Investment Securities." [9] § 8–301(1) provides that the purchaser of a security acquires his rights in it "upon delivery" of the security to him. Similarly, § 8–302 confers the preferred status of bona fide purchaser upon any purchaser for value who in good faith and without notice of any adverse claim "takes delivery" of a security. "All

Note 7—Continued

| Par Value | Issue |
|---|---|
| $5,000 | Barnwell Co. I.D.R. 7¾%, 4/1/87 |
| $5,000 | Barnwell Co. I.D.R. 7¾%, 4/1/86 |
| $15,000 | NYC 6%, 11/1/85 |
| $5,000 | LaGrange I.D.R. 8%, 12/15/80 |

**8.** The familiar rule is that a federal court sitting in a diversity action will apply the substantive law of the forum state, *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including that state's choice of law principles. *Klaxon v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Alland v. Consumers Credit Corp.,* 476 F.2d 951, 955 (2d Cir. 1973). In this case the

parties concur that the Uniform Commercial Code ("UCC") defines their rights. Further, they agree that the controlling enactment of the UCC is that of New York State, New York Uniform Commercial Code §§ 1–101 *et seq.* (McKinney 1964 & 1976–77 Supp.), particularly in light of their shared position that there is no material conflict between the UCC law of New York and that of either Connecticut, the state of which plaintiff was a citizen, *see* footnote 1, or New Jersey, the state in which the Paragon offices were located. Unless otherwise indicated, all references to statutory sections are to the New York UCC, *supra.*

**9.** Municipal bonds are considered to be investment securities and are governed by Article 8 of the UCC. § 8–102(1).

that is required to effectuate a valid transfer of securities between the parties to the transfer is delivery with intent to change ownership." *Brener v. Industrial Steel Container Co.,* 303 Minn. 275, 280. 228 N.W.2d 115, 118 (1975). Consequently, in order to determine whether Matthysse ever acquired ownership rights in the bonds, this court must determine whether "delivery" to him took place despite the undisputed fact that he never acquired physical possession of the certificates.

§ 1–201(14), the general definitional section of the UCC, defines delivery with respect to securities as the "voluntary transfer of possession." The provisions governing delivery of securities to a purchaser are set forth more specifically in § 8–313(1):

> § 8–313. When Delivery to the Purchaser Occurs . . .
>
> (1) Delivery to a purchaser occurs when
>
> (a) he or a person designated by him acquires possession of a security; or
> (b) his broker acquires possession of a security specially indorsed to or issued in the name of the purchaser; or
> (c) his broker sends him confirmation of the purchase and also by book entry or otherwise identifies a specific security in the broker's possession as belonging to the purchaser; or
> (d) with respect to an identified security to be delivered while still in the possession of a third person when that person acknowledges that he holds for the purchaser; or
> (e) appropriate entries on the books of a clearing corporation are made under Section 8–320.

■ It is clearly established that under § 8–313(1)(a) the purchaser must obtain actual physical possession of the security to obtain delivery and ownership. *Kaufman v. Diversified Industries, Inc.,* 460 F.2d 1331, 1334 (2d Cir.), *cert. denied,* 409 U.S.

1038, 93 S.Ct. 517, 34 L.Ed.2d 487 (1972); *Rare Earth, Inc. v. Hoorelbeke,* 401 F.Supp. 26, 41–42 (S.D.N.Y.1975). The Official Comment to § 8–313 advises that "Subsection 1(a) states the concept of prior Acts which contemplated an *actual transfer* of possession of the original instrument as the essential element of delivery." [emphasis added]. It is conceded that neither plaintiff nor his designee, Fidelity Trust Co., acquired physical possession of the bonds. Consequently, delivery did not take place and plaintiff could not acquire ownership under § 8–313(1)(a).

■ Nor could delivery have been effected pursuant to § 8–313(1)(b). The bonds at issue here are conceded to have been bearer bonds. Thus, since they were neither indorsed to plaintiff nor issued in his name, as required under § 8–313(1)(b), that subsection is inapplicable.

■ Plaintiff properly makes no claim that delivery of the bonds occurred pursuant to § 8–313(1)(e), for this subsection concerns bookkeeping entries made by a clearing corporation under § 8–320. Although it did perform clearing functions, SPS was not a "clearing corporation" as defined by § 8–102(3),[10] and consequently § 8–313(1)(e) does not apply.

It remains to be determined whether delivery of the bonds which Matthysse ordered from Paragon came within the provisions of either § 8–313(1)(c) or § 8–313(1)(d). These subsections, as well as (1)(b), are specifically addressed to the relationship of the buying customer to his broker, a relationship recognized to be "unique, partaking of various aspects of agency, bailment, trust and pledge. . . . [Pursuant to these subsections] delivery may be completed while the security is still in the hands of the broker. When the factual situations described in subsections (1)(b), (c), and (d) occur *delivery to the purchaser*

---

**10.** UCC § 8–102(3) provides:

"A 'clearing corporation' is a corporation all of the capital stock of which is held by or for a national securities exchange or association registered under a statute of the United States

such as the Securities Exchange Act of 1934." 80% of the stock of SPS was owned by W. E. Hutton & Co., and SPS's president and executive vice president owned 12% and 8%, respectively.

*is complete,* and no intervening notice of adverse claims before he takes actual physical possession of the security can divest him of his rights." Official Comment 1 to § 8–313 [emphasis added].

■ § 8–313(1)(c) provides that a selling broker completes delivery to his customer when he sends him confirmation of the sale "and also by book entry or otherwise identifies a specific security in the broker's possession as belonging to the purchaser." The requirement that confirmations be "sent" to the purchaser was plainly met by Paragon.[11] Confirmation tickets were mailed by Molot to plaintiff in care of his nominee, Fidelity Trust Co., on August 1 or 2, 1973, and were received by plaintiff shortly thereafter.

■ The requirement that a specific security be identified was satisfied as to the Lake of Egypt and New York UDC bonds, but only as to them. Paragon sent and SPS received properly completed confirmation and delivery tickets concerning those issues. Upon receipt, SPS physically allocated specific certificates corresponding to those instructions and recorded explicitly identifying information on the delivery forms, including the certificate numbers and Matthysse's name. These activities constituted sufficient identification "by book entry *or otherwise*" [emphasis added] of a specific security in the cases of the Lake of Egypt and New York UDC bonds to meet the provisions of § 8–313(1)(c). *See In re McMillan, Rapp & Co.,* 123 F.2d 428 (3rd Cir. 1941) (specific security "identified" by being placed in envelope with customer's name). As to the remaining bonds, for which delivery instructions were not received by SPS, it is clear that no such identification can be considered to have been made, and consequently those bonds were not delivered under § 8–313(1)(c).

■ Without conceding the foregoing, defendant SPS has argued primarily that

delivery could not have occurred as to any issues, including Lake of Egypt and New York UDC, since this subsection requires that the identified securities be "in the broker's possession" and it is agreed that SPS, not Paragon, always maintained possession of the bonds here at stake. However, this court concludes that § 8–313(1)(c) did not require Paragon to maintain actual physical possession of the certificates inside its own offices. Paragon's effective "possession" of the bonds ordered from it by Matthysse is established for purposes of this subsection by virtue of its contractual relationship with SPS, which held the bonds on behalf of Paragon as its clearing agent and subject to its directions.

Pursuant to the terms of its clearance agreement with Paragon, SPS essentially undertook to deliver such bonds as specified by Paragon, to such customers as specified by Paragon. The delivery instructions which SPS sent to Paragon covering the Lake of Egypt and New York UDC issues expressly directed that delivery was to be completed to Matthysse without receiving payment from him, for Paragon had already debited his outstanding $85,000 account towards the purchase. In the circumstances of this case, the possession of the bonds by SPS, Paragon's clearance agent, was sufficient to satisfy the possession requirement of § 8–313(1)(c). *Le Marchant v. Moore,* 150 N.Y. 209, 44 N.E. 770 (1896); *see Weiss v. Dempsey-Tegeler,* 443 S.W.2d 934, 935, 936 (Tex.Civ.App.1969); *cf. Rare Earth, Inc. v. Hoorelbeke, supra,* 401 F.Supp. at 41–43 (finding "constructive possession" by agent to satisfy the "actual physical possession" requirement of § 8–313(1)(a).

*Le Marchant v. Moore, supra,* remains the leading case analyzing the delivery circumstances now codified in § 8–313(1)(c), and is in fact cited in the New York Annotations as authority for the principle that this subsection is in accord with decisional law.

---

11. § 1–201(38) provides in pertinent part:

"Send" in connection with any writing or notice means to deposit in the mail or deliver for transaction by any other usual means of communication with postage or cost of transmission provided for and properly addressed and in the case of an instrument to an address specified thereon or otherwise agreed.

N.Y. Uniform Commercial Code § 8–313 at 260 (McKinney 1964). Plaintiffs in *Le Marchant* ordered a quantity of shares from Evans & Co. ("Evans"), their broker with whom they had a credit account sufficient to cover the purchase price of the shares ordered. Evans in turn placed an order for the necessary shares with the defendant broker, Moore & Schley, with whom it maintained an account which, however, was not sufficient to pay for the shares in full. Defendant Moore & Schley promptly made the purchase and notified Evans, charged the same upon their books to Evans's account, and retained physical possession of the shares as security for the balance due on the Evans account. Evans cabled plaintiffs to confirm the purchase and, acting pursuant to plaintiffs' immediate instructions, directed defendant to deliver the shares to plaintiff's nominee bank. Defendant thereupon delivered half of the shares as instructed and retained the other half in its own possession.

Two days later Evans made a general assignment of assets for the benefit of creditors. Shortly thereafter plaintiffs learned that defendants continued to retain in its possession half of the shares they had ordered from the now defunct Evans & Co. Defendant disregarded plaintiffs' request that it deliver those stocks to them or account to them for the proceeds of the liquidation sale of the shares and, under instructions from the assignee of Evans & Co., sold the stocks it still held, cancelled the remaining indebtedness of Evans & Co. and handed over the balance of the sale proceeds to the assignee.

Upon the suit by the purchasers for the balance of the proceeds which defendant had turned over to the assignee, the New York Court of Appeals held that plaintiffs took title to the shares when the shares ordered had been obtained and plaintiffs notified, notwithstanding the fact that physical possession of the shares never passed from the defendant to Evans:

> The pivotal question upon which the rights of the parties depend is that of the ownership of the stock in question. . . .

[Plaintiffs] ordered Evans & Company, their bankers in Boston, to purchase the stock in question. . . . [A]s soon as they complied with the order, made the purchase, and notified the plaintiffs of such purchase, the transaction was then completed, so far as the title to the stock was concerned. The plaintiffs could not thereafter repudiate the purchase or refuse to accept the stock. Neither could Evans & Company disaffirm and retain the stock as their own. The rights of the parties, so far as the title was concerned, then became fixed, independent of the question of payment. If the stock had not been paid for, Evans & Company, doubtless, would be entitled to hold it as pledgee until payment was made; but, inasmuch as the plaintiffs had to their credit with Evans & Company more than sufficient to pay for the stock, the law would apply the amount thereof as an offset to any claim for payment that Evans & Company could make as against the plaintiffs.

It is contended, however, that no title to the stock passed to the plaintiffs, for the reason that Evans & Company did not purchase and take into their possession the stock. What they did do was to order the defendants, their correspondents in New York, to purchase the stock on their account. This was done, and the amount paid therefor was charged to Evans & Company, and the defendants so reported to Evans & Company. Evans & Company did not forward the money to the defendants to pay for the stock, but allowed the amount thereof to be charged against them, and the stock to remain in the hands of the defendants as collateral security for any balance that might be owing on their general account. This was their customary course of dealing. Evans & Company then became the owners; the defendants the pledgees in possession.

After this had occurred, Evans & Company cabled the plaintiffs that they had purchased the stock in compliance with their order, *thus transferring to the plaintiffs their title to the stock*. The

wrong to the plaintiffs, perpetrated by Evans & Company, was in leaving the stock in the hands of the defendants pledged for the payment of their indebtedness. *But this fact does not operate to prevent the title vested in Evans & Company from passing to the plaintiffs.* They became vested with the title, subject only to the lien of the defendants. The title being in the plaintiffs, it did not and could not pass to the assignee under the assignment of Evans & Company. 150 N.Y. at 215–216, 44 N.E. at 772 [emphasis added].

■ Consequently, when a broker executes a purchase or otherwise maintains ownership of securities, identifies the securities, and sends confirmation to the purchaser, delivery to that purchaser is complete under § 8–313(1)(c), even if the broker himself has not maintained actual physical possession of the certificates. *Le Marchant v. Moore, supra; see Tangorra v. Hagan Investing Corp.,* 38 A.D.2d 671, 327 N.Y. S.2d 131 (4th Dept. 1971); *DuPont, Glore Forgan, Inc. v. Mariash,* 75 Misc.2d 450, 347 N.Y.S.2d 886 (App. Term 1st Dept. 1973); *Miller v. Dean Witter & Co.,* 64 Misc.2d 105, 314 N.Y.S.2d 380 (Civ.Ct.Bronx Co.1970); Sirota v. Econo-Car International, Inc., *556 F.2d 676, 681 (2d Cir. 1977);* Sutro Bros. & Co. v. Indemnity Insurance Co. of North America, *264 F.Supp. 273, 285–86 (S.D.N.Y.),* aff'd, *386 F.2d 798 (2d Cir. 1967);* Weiss v. Dempsey-Tegeler & Co., supra; McNair v. Davis, *68 F.2d 935, 937–38 (5th Cir. 1934);* see also Rudolfer v. Hudson Shipping Co., *158 N.Y.S.2d 950 (Sup.Ct.N.Y.Co.1956);* In re Kadar's Estate, *3 Misc.2d 479, 154 N.Y. S.2d 280 (Sur.Ct.N.Y.Co.1956);* Fisher v. Clark, *3 F.2d 621 (S.D.N.Y. 2 Cir. 1924).*

The sole case relied upon by SPS to support its contention that delivery to Matthysse was never effected under § 8–313(1)(c) because Paragon did not have literal physical possession of the bonds, *Wills v. Investors Bankstocks Corp.,* 257 N.Y. 451, 178 N.E. 755 (1931), is distinguishable in crucial factual respects. In *Wills,* at the time the seller of the securities confirmed the sale to

his purchaser the securities so "confirmed" had not yet been issued. *Id.* at 454, 178 N.E. 755. Accordingly, the New York Court of Appeals concluded that since *neither* the seller *nor* the agent contractually retained to transfer the shares to the purchaser possessed the stock or held title to it until after the sale agreement was concluded with the purchaser, title to the stock did not pass to that buyer. *Accord, Shaw v. Dreyfus & Co.,* 64 Misc.2d 122, 314 N.Y.S.2d 372 (Civ.Ct.N.Y.Co.1969), *vacated per stip. of dismissal,* [1969–1970 Transfer Binder] Fed.Sec.L.Rep. ¶ 92,608 (Civ.Ct.N.Y.Co. 1970).

By contrast, in the instant case defendant concedes that Paragon had title to the bonds.[12] At the time Paragon sent sale confirmations to Matthysse, the Lake of Egypt and New York UDC issues so confirmed were owned by Paragon, were allocated to the account maintained on its behalf by defendant SPS, and were the subject of delivery instructions sent to and received by SPS. In light of the foregoing this court concludes that delivery to Matthysse of the Lake of Egypt and New York UDC issues, and only those issues, was completed pursuant to § 8–313(1)(c).

■ Insofar as this court has determined that delivery of these two issues came within the provisions of § 8–313(1)(c), it need not consider the application of § 8–313(1)(d) to those bonds. As to those bonds for which delivery was not effected under § 8–313(1)(c), this court concludes that lack of proper identification similarly constitutes a fatal obstacle to delivery under § 8–313(1)(d). Furthermore, SPS took no steps which could be considered to constitute an "acknowledgment" that it held those bonds as to which delivery tickets were received on Matthysse's behalf.

*Plaintiff as Bona Fide Purchaser*

■ The foregoing analysis establishes that as between Paragon and Matthysse, delivery of the Lake of Egypt and New York State UDC bonds was completed pur-

**12.** Defendant's Answering Memorandum, p. 10.

suant to § 8–313(1), and that consequently Matthysse acquired Paragon's rights in the bonds. § 8–301(1). Defendant SPS, however, contends that even if Matthysse did obtain any rights they must be subordinated to its own interest in the securities because, it argues, it had a perfected security interest in the form of a prior and superior possessory lien on the bonds. Plaintiff both denies the validity of defendant's alleged security interest and affirmatively argues that he acquired the rights of a bona fide purchaser, thus taking free of whatever claim defendant might have. Assuming without deciding that SPS did have a valid security interest in the Paragon securities in its possession,[13] this court finds that Matthysse is properly entitled to the preferred status of bona fide purchaser and thus acquired rights to the Lake of Egypt and New York UDC free of any claim by SPS.

As established *supra*, Matthysse acquired his rights in the bonds by a "voluntary transaction creating an interest in [the] property," and therefore became a purchaser. § 1–201(32) and (33). § 8–301(2) provides that "[a] bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim," and defendant's claimed security interest is included within the meaning of "adverse claim," § 8–301(1). § 9–309 expressly provides that "[n]othing in [Article 9 of the UCC] limits the rights of a . . . bona fide purchaser of a security (Section 8–301) and such . . . purchasers take priority over an earlier security interest even though perfected."

§ 8–302 establishes that "[a] bona fide purchaser is a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form . . . ." Plaintiff's pre-existing credit due him from Paragon constituted "value" for the purchase, § 1–201(44). The requirement of "good faith" means "honesty in fact in the conduct or transaction concerned." § 1–201(19). § 8–304(3) provides in pertinent part that to amount to "notice" of an adverse claim "the purchaser must have knowledge of the claim . . . or knowledge of such facts that his action in taking the security amounts to bad faith."

The essential issues for this court to determine are whether Matthysse acted in good faith and without notice of the claimed interest of SPS in ordering the bonds from Paragon. This is a question of fact to be answered upon consideration of all the circumstances of the transaction, *United States Fidelity & Guaranty Co. v. Goetz*, 285 N.Y. 74, 78, 32 N.E.2d 798 (1941); *United States Fidelity & Guaranty Co. v. Coca-Cola Co.*, 49 A.D.2d 849, 374 N.Y.S.2d 106 (1st Dept. 1975). Only *actual* knowledge, or bad faith disregard of suspicious circumstances, can establish notice: negligence is not enough. § 8–304(3); *Soma v. Handrulis*, 277 N.Y. 223, 233, 14 N.E.2d 46 (1938); *Gramatan Nat'l Bank & Trust Co. v. Mikolajczak*, 142 N.Y.S.2d 564 (Sup.Ct. Mont.Co.1955); *Coopersmith v. Maunz*, 227 App.Div. 119, 237 N.Y.S. 1 (4th Dept. 1929); *United States Fidelity & Guaranty Co. v. Royal Nat'l Bank of New York*, 413 F.Supp. 43, 48–49 (S.D.N.Y.), *aff'd*, 545 F.2d 1330 (2d Cir. 1976). Bad faith "is not mere carelessness. It is nothing less than guilty knowledge or willful ignorance. . . . [The purchaser] is not bound at his peril to be upon the alert for circumstances which might possibly excite the suspicion of wary

---

**13.** Defendant claims that under the terms of its clearance agreement with Paragon, *see* footnote 3, it held Paragon securities as collateral for funds advanced to Paragon, and that its right to liquidate them in enumerated circumstances was a possessory lien constituting "a security interest" in the bonds, § 1–201(37), which was created by a proper security agreement, § 9–105(1)(h), had properly attached, § 9–204(1), and was perfected, § 9–303(1), once SPS had taken possession of the bonds,

§§ 9–304(1), 9–305. *See Le Marchant v. Moore*, 150 N.Y. 209, 44 N.E. 770 (1896); *Stock Clearing Corp. Inc. v. Weis Securities, Inc.*, 542 F.2d 840, 842–843 (2d Cir. 1976). In light of its disposition of the case, this court need not pass on this claim or on plaintiff's argument that any interest which SPS held on the bonds was invalid and unenforceable by reason of its failure to file a security agreement, § 9–205, and its alleged practice of permitting Paragon free access to the collateral.

vigilance." *Hall v. Bank of Blasdell*, 306 N.Y. 336, 341, 118 N.E.2d 464, 467 (1954), quoting *Manufacturers & Traders Trust Co. v. Sapowitch*, 296 N.Y. 226, 72 N.E.2d 166 (1947). Assuming that plaintiff bears the burden of demonstrating his good faith and lack of notice, *see United States Fidelity & Guaranty Co. v. Goetz, supra*, 285 N.Y. at 79, 32 N.E.2d 798; *but see Gramatan Nat'l Bank & Trust v. Mikolajczak, supra*, 142 N.Y.S.2d at 566, the court finds upon examining the testimony and evidence at trial that plaintiff has sustained the burden and established that he ordered all the disputed bonds, and acquired rights in the Lake of Egypt and New York UDC issues, in good faith and without notice of adverse claim. Consequently, he took the Lake of Egypt and New York UDC issues as a bona fide purchaser, § 8–302, and SPS wrongfully appropriated those bonds.

Without reviewing at length the facts set forth *supra*, the court notes the following pertinent details. When Matthysse spoke on the telephone with Molot, Paragon's salesman, on July 31, 1973, he had no reason to suspect Paragon was insolvent, or was about to become so. Matthysse testified that he believed, as Molot informed him, that Paragon was solvent but was about to undergo a voluntary arrangement which would entail a freeze on the funds in his credit account for 30 to 60 days, and that his funds would be available in full thereafter. He chose to purchase bonds then rather than wait the expected period of time his funds would be tied up, although, in accordance with his standard investing practice, he insisted that Molot locate and recommend a number of issues which would be suitable for his investment portfolio. Molot subsequently advised him of an appropriate selection of bonds and Matthysse, satisfied that they would upgrade his portfolio, placed his order.

In light of these facts, and assuming that plaintiff's knowledge of Paragon's imminent insolvency would preclude a finding of good faith, the information Matthysse received from Molot could not constitute notice of defendant's adverse claim. He had been dealing with Paragon for a year and a half, and had already invested in five of the municipals so recommended. He had purchased a Lake of Egypt bond as recently as one month earlier, and had no reason to believe that these orders would fail to be similarly executed. Plaintiff appeared to be a candid and forthright witness and this court specifically finds his testimony to be credible.

Testimony was presented which supported plaintiff's position and tended to establish that various officers of Paragon and SPS also believed Paragon to be solvent as of July 31, 1973. Of course, even if Paragon in fact had been insolvent as of that time, § 8–302 and the cases cited *supra* establish that Matthysse could not be considered to have had notice thereof without actual knowledge or a disregard of suspicious circumstances amounting to bad faith. This court finds that he did not have actual knowledge and concludes that the circumstances are not so suspicious as to overcome its finding of plaintiff's honesty in fact. *See Overseas Credit Corp. v. Cal-Tech Systems, Inc.*, 20 A.D.2d 355, 247 N.Y.S.2d 252 (1st Dept. 1964).

Defendant also claims that plaintiff was given notice of its security interest in the bonds he ordered from Paragon because, after placing his July, 1973 order, he had received through the mail a certificate for the bond ordered accompanied by a delivery ticket bearing the statement:

> Received from Securities Processing Services, Inc. the securities listed above, which remain the property of Securities Processing Services, Inc. until paid for. Kindly sign and return.

Assuming plaintiff examined this statement, nothing in it would suggest that SPS maintained any claim to the bond adverse to his own since he had already paid for it in full by directing Paragon to debit his account in the amount of the purchase price.[14] Plaintiff's uncontradicted testimo-

---

14. Furthermore, SPS concedes that Paragon had title to the bonds, *see* footnote 12, *supra*.

It thus argues that Matthysse was on notice of its adverse claim despite the facts that (1) Par-

ny established that he knew nothing of any financial relationship between Paragon and SPS. In this context, the language concerning SPS's "property" would reasonably have been treated by Matthysse to amount merely to his acknowledgment of physical receipt of the certificates and could not have bound him or put him on notice of an adverse claim to securities he would order from Paragon one month later.

#### Damages

The issue of damages remains to be determined. SPS concedes that it sold the New York UDC bonds through Notine & Co. sometime between August 6 and August 8, 1973 for $9,914.17, and plaintiff has stipulated that this sale was commercially reasonable. Accordingly, plaintiff is entitled to recover such sum as damages for the conversion of that issue. SPS did not effect the sale of the Lake of Egypt bond in that period and on August 8 unlawfully transferred the certificate which was rightfully the plaintiff's to the bankruptcy trustee. SPS now claims that no evidence of the market value of that bond was introduced and that consequently no damages can be recovered. However, it was established that the purchase price which Paragon quoted to Matthysse as the current market price on July 31, and at which he bought the bond, was $4,734.53. Matthysse had purchased an identical Lake of Egypt bond two weeks earlier for $4,728.65 which amount he conceded to be the fair market value at the date of the conversion. It is fair to assume, there being no proof to the contrary, that the market value did not fluctuate significantly between the date of the purchase and the date of the conversion.

In accordance with the foregoing, this court dismisses so much of plaintiff's complaint as seeks to recover damages with respect to those issues for which delivery was not completed, and directs that the clerk enter judgment for plaintiff in the amount of $14,642.82, together with interest from August 3, 1973 and taxable costs.

So Ordered.

agon, the party with whom Matthysse conducted his investment transaction, was recognized to have title in the securities, and (2) Matthysse had paid Paragon in full. This argument, inadequate on its face, ignores the additional fact that when Matthysse had previously ordered a bond from Paragon and paid for it by crediting against his account, the accompanying ticket had been marked "Paid" by SPS, clearly advising Matthysse that he took free of any adverse claim. Matthysse had every reason to expect that the July 31, 1973 order would be similarly executed.