**WICHITA FEDERAL SAVINGS AND LOAN ASSOCIATION; Northwestern Savings and Loan Association; City of Farmington, New Mexico; Mutual Federal Savings and Loan Association; First Federal Savings and Loan Association of Waterloo; and Security First Federal Savings and Loan Association, Plaintiffs,**

v.

**COMARK and Marine Midland Bank, N.A., Defendants.**

**MARINE MIDLAND BANK, N.A., Third-Party Plaintiff,**

v.

**E. Keith OWENS and Robert W. Bell, Third-Party Defendants.**

No. 82 Civ. 4703(MEL).

United States District Court, S.D. New York.

Feb. 25, 1985.

On Reargument May 1, 1985.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, N.Y., for plaintiffs; Harvey Kurzweil, David B. Howorth, Jonathan W. Miller, Neil Tublin, New York City, of counsel.

Sullivan & Cromwell, New York City, N.Y., for defendant Marine Midland Bank, N.A.; Philip L. Graham, Jr., James W. Dabney, Robert F. Salvia, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., New York City, N.Y., for U.S. Dept. of the Treasury; Paul K. Milmed, Asst. U.S. Atty., New York City, of counsel.

James H. Oltman, New York City, N.Y., for Federal Reserve Bank of New York, Board of Governors of the Federal Reserve System, and Federal Open Market Committee; Marysue Sullivan, Ashby G. Hilsman, New York City, N.Y., of counsel.

Michael Bradfield, Board of Governors and General Counsel, Federal Open Market Committee, Board of Governors of the Reserve System, Washington, D.C.; Marysue Sullivan, New York City, N.Y., of counsel.

LASKER, District Judge.

This motion presents the issue, simply stated though analytically complex, of whether defendant Marine Midland Bank, N.A. ("Marine"), or the plaintiffs, five savings and loan associations and a municipality,[1] are entitled to priority in claiming ownership of eight government securities worth, according to their face value, $10.5 million. Marine moves for summary judgment to dismiss the claims asserted against it as to these securities on the grounds that, as between the plaintiffs and Marine, both federal and state law establishes Marine's priority claim over them.[2] For the reasons set forth below, the motion is denied because Marine's rights in the securities are determined by state law, specifical-

---

1. They are: Wichita Federal Savings and Loan Association, Northwestern Savings and Loan Association, Federal Savings and Loan Association, First Federal Savings and Loan Association, and the City of Farmington, New Mexico.

2. The parties' submissions relating to this motion have been near-mountainous. The memoranda of law alone exceed two hundred pages and more than two hundred exhibits have been submitted.

ly the Uniform Commercial Code as incorporated under New York law, and because a question of fact exists as to whether the securities were "delivered" to the plaintiffs within the meaning of U.C.C. § 8–313(1)(c).

## I.

The facts alleged in this case have been discussed in an earlier published opinion, *Wichita v. Comark,* 586 F.Supp. 940 (S.D. N.Y.1984). Before it began to liquidate its business in June of 1982, defendant Comark, a California limited partnership, was in the business of buying and selling government securities. Plaintiffs were former Comark customers on whose behalf Comark had purchased, *inter alia,* a total of eighteen government securities valued at $17 million which Marine foreclosed on in June of 1982. Marine was Comark's clearing agent for all book entry government securities and money market instruments from early 1981 through the middle of 1982.

Between March of 1981 and June of 1982 Marine executed, pursuant to Comark's instructions, thousands of securities trades for Comark, with an average face value of more than one hundred million dollars per day. Most of these trades, and the ones relevant to this motion, were accomplished through electronic book-entry procedures which establish ownership in a traded security through the use of a computer record, as opposed to paper certificates.[3] As part of its clearing agency relationship with Marine, Comark opened demand deposit and clearance accounts with Marine and advised its trading partners to designate Marine as the bank to which all traded securities were to be transferred. Upon receipt of the appropriate instruction from Comark, Marine would effectuate a transfer of securities by electronically instructing the Federal Reserve Bank of New York ("New York Fed") to debit or credit its book-entry account holding government securities and its cash or reserve account.

Marine would then also make the appropriate debit or credit to Comark's accounts on Marine's books and any changes would be reflected in daily Account Position and Priced Holding Reports sent by Marine to Comark. While both Comark and Marine recorded on their respective books whether they traded or held securities for themselves or for customers, all of the securities in Marine's New York Fed book-entry account were held in Marine's name.

As part of the clearing process, Marine would regularly make overnight "clearance loans" to Comark averaging twelve million dollars per day. These loans were intended to cover the difference between the value of securities received on Comark's behalf and Comark's cash balance with Marine. The terms of the loans were governed by a General Loan and Security Agreement dated January 22, 1981 under which Comark conveyed to Marine a floating security interest and lien on the contents of Comark's security clearance and demand deposit accounts with Marine.

On June 3, 1982 Marine, concerned that Comark's clearance loan was undercollateralized, made a demand upon Comark to repay immediately its outstanding loans of over $20 million. When Comark failed to make payment, Marine foreclosed on and sold government securities with a face value of $27 million which, under the terms of the General Loan and Security Agreement, Comark had previously pledged to it as collateral for the loan.

Plaintiffs claim that they actually owned a substantial portion of these securities, with a combined face value totaling $17 million, that their interests in the securities were superior to Marine's, and that any security interest which Marine might have had in these securities accordingly did not take priority over plaintiffs' ownership interests. The amended complaint alleges that the plaintiffs acquired their interest in the liquidated securities through outright security purchases from, repurchase agree-

---

**3.** *See generally* Hoey & Rassnick, *Automation of Government Securities Operations,* 19 Jurimetrics J. 176, 180 (1976); Rassnick, *Certificateless* *Deposits and Transfers of Securities in the Federal Reserve System,* 26 Bus.Law. 611, 611 (1971).

ments ("repos"), or matched reverse repurchase agreements ("reverse repos") with Comark, and that Comark retained a security interest in the securities through collateral agreements with the plaintiffs.[4] They now sue Comark and Marine to recover the value of the liquidated securities.

Marine moves for summary judgment to dismiss the claims against it as to those securities with a face value of $10.5 million which, it asserts, Comark, using money advanced by Marine, purchased from third parties unrelated to the plaintiffs. These securities, Marine claims, were pledged by Comark to Marine pursuant to the General Loan and Security Agreement, were continuously in Marine's possession, were never delivered or segregated by Marine for the benefit of any third party, and were all held in Marine's electronic book-entry account at the New York Fed.[5]

## II.

### A.

The threshold issue presented by the motion is whether federal or state law applies. Marine argues that it is entitled to summary judgment as a matter of federal law under Section 306.118(a) of the federal Book Entry Regulations, which govern day to day government securities electronic clearing operations for Federal Reserve ("Fed") member banks. 31 C.F.R. §§ 306.-

115—306.122 (1984).[6] Subsection (a) to Section 306.118 provides in relevant part:

(a) A transfer or a pledge of book-entry Treasury securities to ... any transferee or pledgee eligible to maintain an appropriate book-entry account in its name with a Reserve bank under this subpart, is effected and perfected, notwithstanding any provision of law to the contrary, by a Reserve bank making an appropriate entry in its records of the securities transferred or pledged. The making of such an entry in the records of a Reserve bank shall: ...

(3) constitute the transferee or pledgee a holder; and (4) if a pledge, effect a perfected security interest therein in favor of the pledgee. A transfer or pledge of book-entry Treasury securities effected under this paragraph shall have priority over any transfer, pledge, or other interest, theretofore or thereafter effected or perfected under paragraph (b) of this section or in any other manner.

*Id.* Marine contends that as a result of its advancing overnight loans to Comark, Comark's accompanying pledge of securities to Marine as collateral under the General Loan and Security Agreement, Marine's holding of the securities in its New York Fed book-entry account, and the operation of the Book Entry Regulations, Marine became a "holder" of the securities

**4.** The amended complaint more specifically alleges that one or more plaintiffs deposited some of the securities in question with Comark and that Comark acquired an interest in them pursuant to a collateral agreement; that Comark sold some of the securities to the plaintiffs, the securities were left on deposit with Comark, and Comark retained a security interest in them through a collateral agreement; that one plaintiff, the City of Farmington, entered into a repo with Comark under which Comark sold it a government security and that the City agreed to resell the security to Comark at a later date; and that another plaintiff, Northwestern Savings and Loan Association, entered into a reverse repo with Comark under which Comark purchased a government security from Northwestern and agreed to sell it back to Northwestern.

The amended complaint also alleges "that Comark represented to the plaintiffs that securities which they had purchased from Comark would

be segregated in safekeeping accounts; that the securities were instead deposited and integrated in a Marine account with other securities owned either by Comark or other customers; that Comark used the plaintiffs' securities as collateral for a loan from Marine; and that Marine sold the plaintiffs' securities to satisfy debts owed by Comark." *Wichita v. Comark, supra,* 586 F.Supp. at 942.

**5.** Marine does not seek to dismiss the claims against it as to those securities with a face value of $6.5 million which the plaintiffs allegedly deposited with Comark before the time when Comark pledged them to Marine. *See* Amended Complaint, ¶¶ 12, 14, 17, 19 & 21.

**6.** The regulations were promulgated by the Secretary of the Treasury pursuant to 31 U.S.C. §§ 752–64 (1976); *see generally* Rassnick, *supra* note 3, at 613 & n. 12.

and obtained a security interest superior to "any transfer, pledge, or other interest theretofore or thereafter effected or perfected." *Id.* Marine relies upon the plain language of subsection (a) which states that the subsection applies to "any transferee or pledgee [which, like Marine, is] eligible to maintain an appropriate book-entry account in its name with a [Federal] Reserve bank under this subpart". *Id.*

Plaintiffs contest the applicability of subsection (a) and argue that state law governs the disposition of this motion under subsection (b) of Section 306.118. The relevant portions of that subsection provide:

> (b) A transfer or a pledge of transferable Treasury securities, or any interest therein, which is maintained by a Reserve bank ... in a book-entry account under this subpart, including securities in book-entry form [held by a member bank of the Federal Reserve for the account of its customers], is effected, and a pledge is perfected, by any means that would be effective under applicable law to effect a transfer or to effect and perfect a pledge of the Treasury securities, or any interest therein, if the securities were maintained by the Reserve bank in bearer definitive form.

31 C.F.R. § 306.118(b) (1984). Plaintiffs contend that the subsection's "applicable law" language should be read as referring to the New York version of the Uniform Commercial Code. They argue, based upon the history of the Book Entry Regulations that the Regulations were initially intended to apply to, *inter alia,* Federal Reserve member banks for their "sole account[s]," *citing,* 31 C.F.R. § 306.117 (1967) ("'(a) The book-entry procedure shall apply to Treasury securities deposited ... by a member bank of the Federal Reserve System for its sole account....'"), and that subsection (b) was subsequently added with the extension of book entry electronic clearance procedures to the customer securities of Fed member banks. Plaintiffs have also submitted an opinion from the Chief Counsel

to the Bureau of the Public Debt which states that the type of government security clearance operations between Marine and the New York Fed relevant to this motion "would not appear to be a transaction that would or could qualify as a pledge under subsection (a) of Section 306.118." [7]

### B.

Review of the "plain language" of the two federal Book Entry Regulation subsections does not suggest an obvious answer to the issue presented. Marine's contention that it is entitled to priority because federal law preempts state law pursuant to the "notwithstanding any law to the contrary" feature of subsection (a), *see* 31 C.F.R. § 306.118(a) (1984), has facial merit inasmuch as the subsection can be argued to apply to a bank like Marine which maintains a book entry account in its name at a Federal Reserve Bank. On the other hand, subsection (b) also appears to apply given the facts of this case because the securities at issue here were held "in a book entry account" by a Federal Reserve member bank for the account of its customers. *See* 31 C.F.R. §§ 306.117(a)(3) & 306.118(b) (1984). This apparent conflict between the two subsections is not resolved, as Marine contends, by simply treating subsection (b) as an additional method for transferring or pledging securities by Fed member banks. The language of (b) makes no reference to the fact that the subsection is intended to be regarded as an additional method for transferring or pledging customer securities. Moreover, the consensus among commentators who have considered the applicability of the two subsections is that subsection (a) governs only those securities held for the sole accounts of member banks while subsection (b) applies to the securities of customers of member banks.

Illustrative of such commentary is the view that "[f]or what appear to be intramural transactions between members of the [Federal Reserve] system, 306.118(a) displaces state law. But where the trans-

---

7. Letter from Calvin Ninomiya, Chief Counsel, Bureau of the Public Debt, to David B. Howorth,

Esq. (Aug. 6, 1984), at Plaintiffs' Exhibit 26, filed Aug. 8, 1984.

fer involves rights of persons who are not members of the Federal Reserve System, subsection (b) applies." Coogan, *The New UCC Article 9*, 86 Harv.L.Rev. 477, 560 (1973) (hereinafter *"Article 9"*). Another similar comment concludes that:

> [t]he 'automatic perfection' provisions of the Treasury Department Regulations are only applicable to book-entry transfers to Federal Reserve Banks and member banks of the Federal Reserve System for their own account. The perfection requirements for nonmember banks and other financial institutions are provided by Treasury Department Regulations in paragraphs (b) of Sections 306.118 and 350.4. ... *These regulations are of particular importance to banks acting as custodian for the accounts of their customers.*

Mitchell, *Repurchase Agreements*, N.Y. L.J., Jan. 26, 1983, at 6 (emphasis added).

In addition, a historical review of the Book Entry Regulations reports that subsection (b) was specifically adopted to cover customer securities held by Federal Reserve member banks.

> When third party or customer securities were authorized to be held in the book-entry system, it became necessary to expand the transfer and pledge provisions of [Treasury Department] Circular No. 300 [, establishing rules for the transfer and pledge of book-entry securities,] to encompass these securities. Leaving undisturbed the rules regarding transfers and pledges between depositors such as member banks for which [Federal] Reserve Banks maintain securities safekeeping accounts, T.D. Circular No. 300 was expanded to provide that pledges and transfers by owners of book-entry securities, other than an owner eligible to maintain a book-entry account in its name, are accomplished [under the terms of subsection (b).]

Hoey & Rassnick, *supra*, note 3, at 181–82.

Marine argues that the history of the federal book-entry procedures and regulations undercuts the quoted opinions because a two year delay occurred between the time when book entry procedures were extended to member bank customer securities in 1971 and the adoption of subsection (b) in 1973. This time lag, in Marine's view, demonstrates that subsection (b) was not intended to be the exclusive method for effecting and perfecting pledges of customer securities. Contrary to Marine's interpretation of the delay's meaning, however, the lag in adopting subsection (b) can be explained by the fact that a crisis relating to growing thefts of government securities in the late 1960's and early 1970's led the Department of the Treasury to formulate "a greatly accelerated program for the further extension of the book-entry procedure" to customer securities. *See* Debs, *The Program for the Automation of the Government Securities Market*, 54 Fed. Reserve Bank of N.Y. Monthly Rev. 178, 180–81 (1972).

In light of the comments and historical analysis, and the opinion letter of the Bureau of the Public Debt's Chief Counsel which, although not dispositive, is entitled to respectful consideration inasmuch as that agency promulgated the regulations in issue, we conclude that subsection (a) of the Book Entry Regulations was not intended to apply to situations in which customer securities were held by Federal Reserve member banks for customer accounts. Accordingly, that portion of Marine's motion for summary judgment which is based upon federal preemption of state law under Section 306.118(a) is denied because subsection (b) governs in this case and the "applicable law" which determines whether Marine has priority to the securities is the Uniform Commercial Code.

### III.

#### A.

Marine also moves for summary judgment on the ground that its claim to the securities in issue are entitled to priority

even as a matter of state law.[8] Marine argues that it obtained a perfected security interest in the securities,[9] and that plaintiffs were not "bona fide purchasers" and did not acquire any "rights" in the securities because plaintiffs never took "delivery" of the securities under the 1962 version of Article 8 of the Uniform Commercial Code,[10] which governs investment securities.[11] Marine relies upon subsection (d) to UCC § 8–313(1) which provides that: "(1) Delivery to a purchaser occurs ... (d) with respect to an identified security to be delivered while still in the possession of a third person when that person acknowledges that he holds for the purchaser; ..." N.Y.U.C.C. § 8–313(1)(d) (McKinney 1964). Marine asserts that the securities were never "delivered" to the plaintiffs because there was no transfer of possession,[12] or acknowledgment by Marine that it held the securities for Comark's customers. Marine asserts that only subsection (d) determines whether "delivery" has been accomplished because the subsection of the federal Book Entry Regulations which governs here, 31 C.F.R. § 306.118(b) (1984),[13] provides that a depositary, like Marine, "shall, for the pur-poses of perfecting a pledge of [book-entry Treasury] securities or effecting delivery of such securities to a purchaser under applicable provisions of law, be ... the third person in possession from which acknowledgement of the holding of the securities for the purchaser may be obtained." *Id.* Marine therefore contends that subsection (d) to Section 8–313(1) necessarily applies in this case because it was "the third person in possession" under the federal regulations.[14]

Plaintiffs concede that they did not take "delivery" of the securities under UCC § 8–313(1)(d) but assert that "delivery" was nonetheless effected under subsection (c) to UCC Section 8–313(1).[15] The subsection provides that delivery to a purchaser occurs when "(c) his broker sends him confirmation of the purchase and also by book entry or otherwise identifies a specific security in the broker's possession as belonging to the purchaser". N.Y.U.C.C. § 8–313(1)(c) (McKinney 1964). Plaintiffs contend that Comark sent purchase and sale confirmation tickets to both the plaintiffs and Marine confirming purchases and identifying the securities at issue as belonging

8. The parties agree that the Uniform Commercial Code enacted under New York law applies in this case.

9. The parties dispute whether Marine acquired a perfected security interest in the securities in issue. However, for the purpose of deciding this motion, it is assumed that Marine obtained a perfected security interest.

10. The New York legislature amended Article 8 in 1982 to apply to transactions accomplished after September 1, 1982. The amended version is inapplicable here because the transactions in question took place before the effective date.

11. UCC § 8–302 defines a "bona fide purchaser" as "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him or in blank." N.Y.U.C.C. § 8–302 (McKinney 1964).
   UCC § 8–301 also defines "rights" acquired by purchasers.
   Rights Acquired by Purchaser; ... Title Acquired by Bona Fide Purchaser
   (1) Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey....
   (2) A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim....
   N.Y.U.C.C. § 8–301 (McKinney 1964).

12. UCC § 1–201(14) generally defines "delivery" with respect to instruments, documents of title, chattel paper or securities as "voluntary transfer of possession." N.Y.U.C.C. § 1–201(14) (McKinney 1964).

13. *See* Part II, *supra.*

14. Marine also argues plaintiffs' failure to take "delivery" or to otherwise give notice of their claims gives rise to an equitable estoppel and they "must bear the loss." *Quoting, People's Trust Co. v. Smith*, 215 N.Y. 488, 494, 109 N.E. 561, 546 (1915) (Cardozo, J.).

15. Plaintiffs also contend that the relevant federal Book Entry Regulation, 31 C.F.R. § 306.-118(b) (1984), does not make acknowledgement by Marine a prerequisite for "delivery" because the language of the Regulation is permissive inasmuch as it states that the purchaser "may" obtain acknowledgement that the depositary holds securities for it.

to the plaintiffs, and that Comark had constructive possession of the securities under New York law despite the fact that the securities were held at all times by Marine. Plaintiffs answer Marine's argument regarding their failure to take "delivery" under subsection (d) by noting that "delivery" occurs under Section 8–313(1) when the requirements for any one of its subsections are met.

### B.

Again, we are faced with a choice of law question as to whether the federal Book Entry Regulations preempt state law. We agree with Marine that 31 C.F.R. § 306.-118(b) preempts state law, to the extent that Marine is characterized as a "third person in possession from which acknowledgement of the holding of the securities for the purchaser may be obtained." *Id.* However, the subsection does not make acknowledgement by Marine a prerequisite for finding "delivery" of the securities in issue here.

This choice of law issue would have no material significance had the transactions giving rise to this case occurred after September 1, 1982, the effective date for the amended version of UCC Article 8. *See* note 10, *supra.* Under such circumstances, "delivery" to the plaintiffs, as Marine argues, would probably not have taken place under state law, *see* N.Y.U.C.C. §§ 8–313(1)(g) & 8–320(1) (McKinney Supp. 1983–84) (requiring entries to be made on the books of a clearing corporation like Marine before "delivery" is effected), or under the federal Book Entry Regulations, assuming that Section 306.118(b) makes acknowledgement by Marine a mandatory requirement for delivery. However, the more difficult question presented here is whether federal law preempts an admittedly-obsolete version of state law, the application of which could conceivably lead to a finding that the securities were "delivered" to the plaintiffs.

Some of the commentary examining the relationship between the Book Entry Regulations and the UCC suggests that Section 306.118(b) completely displaces state law, at least to the extent of obtaining a perfected security interest in book-entry securities which, under state law, would be governed by UCC Article 9. *See* Coogan, *Article 9—An Agenda for the Next Decade,* 87 Yale L.J. 1012, 1039 & n. 97 (1978); *see also* Coogan, *Security Interests in Investment Securities Under Revised Article 8 of the Uniform Commercial Code,* 92 Harv.L.Rev. 1013, 1020 (1979). Other commentary, however, asserts that the "applicable law" language found in Section 306.-118(b) and discussed in Part II, *supra,* makes the transfer of book-entry securities dependent upon the requirements of UCC Article 8 and that the federal regulations do not completely displace state law. *See* Mitchell, *supra,* N.Y.L.J., Jan. 26, 1983, at 6 & n. 38 (noting that "the Treasury Department Regulations [ ], when they desire to preempt reference to the U.C.C., do so explicitly.")

While the language of the Book Entry Regulations is far from clear, we find the latter view more persuasive; that is, that the Book Entry Regulations do not displace state law so as to provide the exclusive method of "delivery." Section 306.118(b) specifically states that depositaries of book-entry securities are to be considered as third persons in possession "for purposes of ... effecting delivery to a purchaser *under applicable provisions of law".* 31 C.F.R. § 306.118(b) (1984) (emphasis added). This clause is consistent with an earlier portion of the same section which provides that a transfer or pledge of book-entry government securities is effected or perfected "by any means that would be effective under applicable law...." *Id.* In light of these comparatively unambiguous references, we find that, while it is appropriate to give meaning to the regulation to the extent of treating Marine as a third person in possession from which the plaintiffs might have obtained acknowledgement that it held the disputed securities for them, Section 306.118(b) does not completely preempt the requirements for delivery under the former version of Arti-

cle 8. It is therefore necessary to refer to the "applicable law," which the parties in this case do not dispute is UCC § 8–313(1), to determine whether plaintiffs took "delivery" of the securities.

Contrary to Marine's contention, we find that Section 8–313(1)(d) does not establish the exclusive means of "delivery." Although Marine may be regarded as a third person in possession and subsection (d) describes the requirements for delivery of securities in the possession of third persons, Section 8–313(1), through the use of the disjunctive "or," provides that "delivery" can be accomplished by any of the means described in each of its subsections. Indeed, the Official Comment accompanying the Section states that:

> [D]elivery may be completed while the security is still in the hands of the broker. When the factual situations described in subsections (1)(b), (c) and (d) occur, delivery to the purchaser is complete, and no intervening notice of adverse claims before he takes actual physical possession of the security can divest him of his rights.

Official Comment 1, N.Y.U.C.C. § 8–313, at 258 (McKinney 1964). *See also Matthysse v. Securities Processing Services, Inc.*, 444 F.Supp. 1009, 1020 (S.D.N.Y.1977) (hereinafter *"Matthysse"*) (fact that securities were "delivered" within the terms of UCC § 8–313(1)(c) meant that court did not have to consider application of UCC § 8–313(1)(d)). Accordingly, since the parties agree that the securities were not "delivered" under Section 8–313(1)(d), the issue to be resolved is whether plaintiffs took "delivery" under Section 8–313(1)(c).

### C.

The three prerequisites for "delivery" under subsection (c) are that the broker send the securities' purchaser confirmation of the sale, that the securities be in the broker's possession and that the securities be identified as belonging to the purchaser. While the parties do not dispute that Comark sent the plaintiffs confirmation tickets reflecting their purchases, they disagree whether Comark had "possession" of the securities within the meaning of § 8–313(1)(c).

In *Matthysse, supra*, the court held that in order to satisfy the "possession" requirement of Section 8–313(1)(c) a broker need not have actual possession when the securities are held by the broker's clearing agent. *See id.* at 1018. The broker in *Matthysse* had entered into a contractual arrangement with its clearing agent by which the agent would lend funds to facilitate the broker's municipal bond transactions and the loans would be secured through a lien placed upon bonds and securities held by the agent for the broker. *See id.* at 1013–14. Following the broker's bankruptcy and failure to meet the clearing agent's demand to repay its outstanding clearance loans, the agent proceeded to liquidate what it considered to be the collateral securing the broker's debt, namely, the securities in its possession. Some of these securities included ones which had been paid for by the broker's customers but which had not been physically delivered to the customers, even though the agent had received delivery instructions from the broker. *See id.* at 1014–16.

As to these securities Judge Gagliardi found, based primarily upon the leading New York Court of Appeals case of *Le Marchant v. Moore*, 150 N.Y. 209, 44 N.E. 770 (1896), that the broker maintained "effective possession" over the securities "by virtue of its contractual relationship with [the clearing agent], which held the [securities] on behalf of [the broker] as its clearing agent and subject to its directions." *Matthysse, supra*, 444 F.Supp. at 1018. Judge Gagliardi noted that the *Le Marchant* court had found, based upon a similar set of facts, that the title to the securities in question had passed from the broker to its clients once the clients received confirmation of the securities' purchase and that " '[t]he title being in the [clients], it did not and could not pass to the assignee[clearing agent] under the assignment of [the broker]' " *id.* at 1019–20, *quoting, Le Marchant v. Moore, supra*, 150 N.Y. at 216, 44 N.E. at 772. Other courts have

consistently followed *Matthysse* and have found that the "possession" requirement of UCC § 8–313(1)(c) under New York law is met when the broker's clearing agent holds securities for the broker's account. *See Louisiana State School Lunch Employees Retirement System v. Legel, Braswell Government Securities Corp.*, 699 F.2d 512, 515 (11th Cir.1983) (hereinafter *"Legel, Braswell"*); *Levy v. Chemical Bank (In re Scott, Gorman Municipals, Inc.)*, 28 B.R. 659, 662 (S.D.N.Y.1983) (hereinafter *"Scott, Gorman"*).[16]

In this case, as in *Matthysse*, Marine acted as Comark's clearing agent and held securities for Comark's account. It would therefore be appropriate to find Comark to have been in constructive possession of the securities in issue so as to meet the "possession" requirement of Section 8–313(1)(c). Marine, however, challenges the use of the constructive possession concept here on the grounds that it was always in possession of the securities through the combined operation of 31 C.F.R. § 306.118(a)(3), making it a "holder" of the securities, and UCC § 1–201(20), which defines a "holder" to be a person who is in possession of an investment security. Alternatively, Marine contends that it always had possession because 31 C.F.R. § 306.118(b) makes it a "third person in possession." However, in light of the finding in Part II, *supra*, regarding the inapplicability of 31 C.F.R. § 306.118(a) to the facts of this case, Marine cannot rely upon that section to defeat the test for possession under UCC § 8–313(1)(c). Moreover, while the federal Book Entry Regulations do make Marine a third person in possession, Marine's status is no different than that of the clearing agents in the *Matthysse* line of cases in which the *Matthysse* brokers were determined to be in effective or constructive possession of securities, even though the agents were third parties in possession of securities for broker accounts.

Marine further challenges Comark's claims of constructive possession on the grounds that *Matthysse* and *Scott, Gorman* do not deal with book-entry securities, that recent amendments to UCC Article 8 now make these cases inapplicable, and that there is "no sound policy reason" to extend the constructive possession concept to book-entry securities. In Marine's view, there is no practical analog to the clearing agent's actual physical segregation of non-book-entry securities in order to meet the "identification" requirement of UCC § 8–313(1)(c) discussed below, other than the clearing agent making the appropriate entries on its own books, which is the form of acknowledgement required in order to take "delivery" by UCC § 8–313(1)(d) and 31 C.F.R. § 306.118(b).

Addressing these arguments in reverse order, we find that Marine's contention raises a question, discussed *infra*, as to whether plaintiffs can show that the securities were sufficiently "identified" as belonging to them to support a finding of "delivery" under Section 8–313(1)(c). The issue of constructive possession, however, does not depend upon the method of identification employed by Marine but upon the contractual relationship between Comark and Marine. *See Scott, Gorman, supra*, 28 B.R. at 662 n. 4 (considering the same issue and noting that possession arises out of the contractual relationship). As to Ma-

---

**16.** *See also Husted v. Blunt, Ellis & Loewi, Inc.*, No. 79 C 38, slip op. (N.D.Ill. Oct. 28, 1981) (available on LEXIS, Genfed library, Dist file) [available in WESTLAW] (finding constructive possession under the Illinois version of UCC § 8–313(c) and citing *Matthysse*); Aronstein, *Investment Securities*, 39 Bus.Law. 1375, 1385 (1984) ("Both courts [in the cases cited in the text] reached the anomalous, but correct, result that under section 8–313(1)(c) securities can be delivered without either the transferor or the transferee being in actual possession.").

Marine notes that *Matthysse* has been criticized in dictum by one court. *See In re Paragon Securities Co.*, 599 F.2d 551, 557 (3d Cir.1979). That case, however, was concerned only with the test for "possession" under the former federal Bankruptcy Act, which is a stricter one than the one employed by the Uniform Commercial Code. *See id.* at 556–57 ("We are unconvinced that 'in the stockbroker's possession' under section 8–313(1)(c) should necessarily be defined the same way for the purposes of construing section 60e [of the Bankruptcy Act]."); *Legel, Braswell, supra*, 699 F.2d at 515.

rine's first two arguments relating to the recent amendments to Article 8, and the lack of discussion about book-entry securities in the relevant cases, even Marine recognizes that the amendments do not apply to the transactions in dispute, *see* note 10, *supra*, and there is nothing in the terms of the earlier version of Section 8–313(1)(c) to suggest that constructive possession cannot be applied to book-entry securities. Finally, while the silence in *Matthysse* and *Scott, Gorman* as to book-entry securities is best explained by the fact neither case involved such investments, we find the reasoning of both cases applicable to the facts of this one. As discussed above, constructive possession, at least with respect to the applicable version of Section 8–313, depends upon the relationship between the broker and its clearing agent. Accordingly, since there appear to be no questions of fact or disputes between the parties regarding the relationship between Comark and Marine, we find that Comark had effective or constructive possession of the securities in issue so as to satisfy the "possession" element of UCC § 8–313(1)(c).

### D.

Marine denies the existence of the third element of delivery under Section 8–313(1)(c), which requires that the securities be identified "by book entry or otherwise . . . as belonging to the purchaser;" N.Y.U. C.C. § 8–313(1)(c) (McKinney 1964). Marine argues that the securities were not, as a matter of law, adequately identified as belonging to the plaintiffs because, in its view, the activities of the clearing agent, not the selling dealer, determine the adequacy of the identification and Marine never identified any book entry securities on its books as belonging to the plaintiffs.

In *Matthysse, supra,* the case upon which Marine relies, securities were held to be inadequately identified when the clearing agent had not received delivery instructions from the broker so as to physically identify them as belonging to purchasers. *See id.,* 444 F.Supp. at 1018. *See also Legel, Braswell, supra,* 699 F.2d at 514

(11th Cir.) (securities identified when clearing agent, acting pursuant to broker's instructions, placed securities in envelope addressed to customer). Courts which have considered the adequacy of identification since *Matthysse* have not, however, focused exclusively upon the activities of the clearing agent. In *Scott, Gorman, supra,* an appeal from a bankruptcy court order dismissing the case, *inter alia,* on the ground that disputed securities had not been "delivered" under Section 8–313(1)(c), purchase confirmation tickets were sent by the broker to the clearing agent which bore "tag numbers" as a means of identifying securities held by the agent. Although the clearing agent argued that the numbers reflected the broker's long and short position on any particular security and that "by no stretch of the imagination" represented an allocation of securities belonging to the purchasers, *see id.,* 28 B.R. at 662 n. 5, Judge Edelstein noted that there existed a dispute regarding the numbers' meaning and remanded the action to the bankruptcy court "to permit the parties to address the issue of the tag numbers, their traditional use, and potential ability to be used for identification consistent with the concept of 'effective possession' under the U.C.C." *Id.,* 28 B.R. at 662–63. Moreover, in *Legel, Braswell, supra,* while securities were found to be adequately identified where the clearing agent had physically segregated them for the purchaser, the Court of Appeals for the Eleventh Circuit noted that the securities might have been identified under Section 8–313(1)(c) once the purchaser had paid for the securities, the broker's books reflected the sale, and the securities had been delivered to the clearing agent. *See id.,* 699 F.2d at 514.

The differing analyses employed in the above cases to determine whether securities have been adequately identified is explained by the differences between identifying securities pursuant to the now-repealed Bankruptcy Act of 1898 on the one hand and UCC § 8–313(1)(c) on the other. In *Matthysse, supra,* Judge Gagliardi determined whether securities had been identified adequately by relying solely upon a

Third Circuit Court of Appeals case, *In re McMillan, Rapp & Co.,* 123 F.2d 428, 430 (3d Cir.1941), *cited in, Matthysse, supra,* 444 F.Supp. at 1018, which in turn found that securities had been "identified" under Section 60e(4) of the old Bankruptcy Act. However, the Act's requirements for identifying securities are more stringent than the Uniform Commercial Code's, as is the Act's test for finding possession by a broker. *See note 16, supra; Legel, Braswell, supra,* 699 F.2d at 515. Section 60(e)(4) provided that securities in a bankrupt broker's possession were specifically identifiable as belonging to a purchaser if "they remained in their identical form in the stockbroker's possession until the date of bankruptcy". 11 U.S.C. § 96(e)(4) (1976) (repealed).

The "identical form" standard requires a court to focus exclusively upon the activities of the possessor of the securities in order to determine whether they have remained in their identical form. *See, e.g., In re Paragon Securities Co., supra,* 559 F.2d at 557 (bonds not identifiable under Section 60e(4) after lien placed upon them while in stockbroker's possession.).

In contrast, UCC § 8–313(1)(c) does not require securities to remain in their "identical form" while in the broker's possession in order to be "identified." Instead, the provision states that the broker need only identify "by book entry or otherwise" a specific security in its possession as belonging to the purchaser. *See* N.Y.U.C.C. § 8–313(1)(c) (McKinney 1964). In the absence of any mention of the need for a security to remain in its identical form, the focus of the courts' attentions have shifted, in the cases in which clearing agents have held securities for broker accounts, from the possessor of the security alone to the activities of the broker as well.

This distinction between the old Bankruptcy Act and the UCC is reflected in *Scott, Gorman, supra,* in which Judge

Edelstein held that securities held by a clearing agent for a broker's account were not in their "identical form" and hence not specifically identifiable under the Bankruptcy Act, *see id.,* 28 B.R. at 661–62, but that a question of fact existed as to whether the securities were identifiable under UCC § 8–313(1)(c). *See id.* at 662–63. In light of this recognized distinction, it is appropriate to look beyond the actions of the clearing agent in possession of securities for a broker's account in order to determine whether the identification element of Section 8–313(1)(c) has been satisfied. In the same way that the contractual relationship between a broker and its clearing agent has supported findings of effective or constructive possession in *Matthysse, Scott, Gorman,* and *Legel, Braswell, see* Part III. C, *supra,* it is possible to find that a broker has constructively identified securities as well. In the usual case, as in the above-cited cases, this would require the clearing agent in actual possession to identify, pursuant to the broker's instructions, securities belonging to the broker's customers. However, in the case in which the clearing agent has received identifying instructions from the broker and has not identified securities in the broker's account as belonging to the broker's customers, it might still be possible to find that the securities were adequately identified under Section 8–313(1)(c) provided that the broker took adequate steps to identify the securities and to notify the clearing agent of the securities' identity and provided that the agent should have taken steps to identify the securities in question. Such a finding would be in keeping with the contractual relationship between the broker and its clearing agent which has supported findings of constructive possession, namely, that the agent holds securities on behalf of the broker and subject to its directions.[17] *See Legel, Braswell, supra,* 699 F.2d at 515; *Scott, Gorman,* supra, 28 B.R. at 662; *Matthysse, supra,* 444 F.Supp. at 1018.

---

**17.** Given this conclusion, the fact that there does not exist for book entry securities a practical analog to the physical separation of actual securities need not prevent plaintiffs from recovering from Marine if they ultimately succeed in proving that Marine should have taken steps to identify the securities in dispute as belonging to them.

In this case, plaintiffs argue that the securities in issue which Marine held for Comark's account were adequately identified, even though Marine did not identify them on its own books as belonging to the plaintiffs, because Comark identified the securities as belonging to the plaintiffs and notified Marine of this fact. Plaintiffs specifically contend that Comark identified plaintiffs as the owners of the securities on its books, that Marine received from Comark copies of purchase confirmation tickets which were sent to the plaintiffs, and that Comark personnel orally notified Marine personnel that the securities belonged to Marine customers. These assertions raise questions of fact, which cannot be answered in a motion for summary judgment, as to whether Marine should have taken steps to identify the securities in issue as belonging to the plaintiffs.

For the foregoing reasons, Marine's motion for summary judgment is denied.

It is so ordered.

### ON REARGUMENT

Since the time when the decision denying defendant Marine Midland's motion for partial summary judgment was handed down, *Wichita v. Comark*, 610 F.Supp. 406 (S.D. N.Y.1985), the plaintiffs and Marine settled the claims between them.[1] However, before this occurred Marine moved, *inter alia*, under Civil Rule 3(j) of the United States District Court for the Southern and Eastern Districts of New York to reargue its motion and we granted leave to the United States Department of the Treasury and the Federal Reserve Bank of New York ("New York Fed") to serve and file a memorandum of law relating to the earlier decision as amici curiae. *See Wichita v. Comark*, No. 82 Civ. 4703(MEL) (S.D.N.Y. Mar. 13, 1985). In light of the significant points raised by Marine and the government's representatives, we take this oppor-

tunity to present their more salient arguments and to comment briefly upon the impact of those arguments on the earlier decision.

The opinion of February 25, 1985 construed 31 C.F.R. §§ 306.118(a) & (b) (1984), and concluded that subsection (b) (and hence "applicable" state law) governed in the instance at hand because the securities which were the subject of the dispute between plaintiffs and Marine were book entry securities held by a Federal Reserve member bank (Marine) for the account of its customer (Comark). *See Wichita v. Comark, supra*, at 409–411. The Treasury Department does not dispute that subsection (b) applies to this case, although it contends that a different analysis, not previously presented or found in our search of the relevant literature, supports this conclusion.

It is the intent of Treasury that, with respect to the rights and liabilities of the Federal Reserve bank making payment as fiscal agent for the Treasury Department, subpart (a) of Section 306.118 of the Book-Entry Regulations is applicable to all transfers and pledges of Treasury securities on the book-entry system, whether the securities represent an investment of the member bank or an investment on behalf of a customer. Thus, federal law would preempt state law and the book-entry would be dispositive for purposes of determining to whom the Federal Reserve bank is legally required to make payment. Subpart (b) of Section 306.118 of the Book-Entry Regulations applies with respect to the rights and liabilities of parties whose interests are recorded on the books of member banks with Federal Reserve book-entry accounts.

Declaration of Paul Allan Schott, Assistant General Counsel for Banking and Finance,

---

1. Settlement occurred after trial had commenced and the trial continued in an abbreviated fashion, limited to fraud claims asserted by plaintiffs and Marine against defendant Comark, and by Marine against third-party defendant Keith Owens, managing director of Comark.

The jury ultimately found Comark liable to both the plaintiffs and Marine in fraud, and we granted Marine judgment n.o.v. holding Owens liable to it as well. *See Wichita v. Comark*, No. 82 Civ. 4703(MEL) (S.D.N.Y. April 17, 1985).

United States Department of the Treasury, ¶ 6, attached to Notice of Motion, filed Mar. 12, 1985. The government has further explained how subsections (a) and (b) interact with each other in a letter which we reprint in full in the appendix to this opinion.

The earlier decision also found that a question of fact existed as to whether the disputed securities were "delivered" to the plaintiffs under Section 8–313(1)(c) of the pre-amended New York version of the Uniform Commercial Code in effect between March of 1981 and June of 1982, the period in which the transactions in question took place. We concluded that although Marine did not actually identify the securities in question as belonging to the plaintiffs, in light of the allegations made by the plaintiffs in their opposing papers Marine might have been under an obligation to make such an identification. *See Wichita v. Comark, supra,* at 413, 416–418.

Marine now renews an argument found in its earlier Reply Memorandum in support of its original motion for summary judgment: that no authority exists to support the proposition that a secured lender can be divested from its perfected security interest through the unilateral acts of a borrower. The Treasury Department and the New York Fed also argue that for policy reasons the unilateral acts of government securities dealers should not be permitted to bind clearing banks under UCC § 8–313(1)(c) and deprive banks of secured creditor status. The government contends that imposing upon clearing banks a duty, under certain circumstances, to identify securities in their possession as belonging to the customers of government securities dealers would compel the banks to regard as unsecured "clearance loans" extended to securities dealers.

The arguments made by Marine, the Department of the Treasury and the New York Fed regarding the proper interpretation of the federal Book Entry Regulations and Article 8 of the Uniform Commercial Code raise significant issues which are worthy of further consideration. Given the settlement of that portion of the case relating to these questions, however, the issues raised are now moot and it would be inappropriate further to consider them. Nonetheless, we recognize the importance of the points made by Marine and the government. Accordingly, in order to mitigate any possible harm to the government securities market caused by the earlier decision, we conclude that the earlier opinion should not be treated as an authoritative interpretation of the federal and state law provisions there construed.

It is so ordered.

## APPENDIX

FEDERAL RESERVE BANK OF NEW YORK

NEW YORK, N.Y. 10045

AREA CODE 212–791–5000

March 14, 1985

The Honorable Morris E. Lasker

United States District Judge

Room 1903

United States Courthouse

Foley Square

New York, New York 10007

Re: *Witicha Federal Savings & Loan Association, et al. v. Comark, et al. 82 CIV. 4703 (MEL)*

Dear Judge Lasker:

As discussed in Chambers on March 12, 1985, this letter is intended to supplement the interpretation of 31 C.F.R. § 306.118 set out at pages 4–8 of our joint Treasury-Federal Reserve memorandum of law.

Subsection (a) of 31 C.F.R. § 306.118 contemplates two types of entries on the books of a Reserve Bank—an entry of transfer and an entry of a pledge. This distinction represents a conscious attempt by Treasury to fit book-entry securities into the existing body of law that controls the

APPENDIX—Continued

transfer and pledge of Treasury securities in physical form, *i.e.*, the Uniform Commercial Code.[1]

Thus, a subsection (a) transfer of book-entry securities, like a transfer of physical Treasury securities in bearer form, is not determinative of beneficial ownership. With respect to each type of security, the transferee acquires possession, the right to receive principal and interest, and the ability to transfer those same rights in the security to others. However, those powers do not make the transferee the beneficial owner of the security. Rather, they permit the issuer, custodians, brokers and other parties who do not assert rights in the security, to rely on the transferee's control of the security in discharging their respective obligations to make payment, safekeep, receive and redeliver that security.

In these respects, a subsection (a) transfer does have "priority over any transfer ... theretofore or thereafter effected ... under [subsection] (b)...." The transferee's power to retransfer the security over Fedwire cannot be abridged by the customer who asserts an interest "theretofore" effected or perfected under subsection (b), nor can the Treasury be required to make payments to a customer who claims that following the transferee's acquisition of the security his interest was "thereafter" effected or perfected. Possession and control of the security on the books of the Federal Reserve Bank always remains in the subsection (a) transferee.

Absent an entry of pledge under subsection (a), the beneficial interests of the subsection (a) transferee are subject to subsection (b) and applicable law. For example, a bank that acts as a trustee may acquire book-entry securities for its trust customers. As a subsection (a) transferee, that trustee bank's rights and authority on the Federal Reserve book-entry system are identical in both the trust securities and securities it owns outright. However, the trustee bank has a state law fiduciary obligation to the trust customer to account for principal and interest and properly maintain the securities. The trustee bank will be liable for unauthorized transfers and, unless the subsequent transferee is a bona fide purchaser, the transferee will be liable in conversion. Thus, the practical effect of the priority accorded a subsection (a) transfer is extremely limited. The Treasury and Federal Reserve Banks are responsible only to the Fedwire transferee;[2] middlemen can rely on a Fedwire delivery without inquiry into the specific rights of the transferor in the securities transferred.[3] However, any party asserting beneficial rights in these securities, including a subsection (a) transferee, remains subject to claims arising under state law that he acquired his rights in a wrongful transaction.

In contrast, a pledge under subsection (a), *i.e.*, one that is directly recorded as a pledge on the books of a Reserve Bank,[4] will confer beneficial rights in the pledged securities,[5] and the pledgee's security interest will defeat conflicting interests of par-

1. *See, e.g., Oscar Gruss & Sons v. First State Bank of Eldorado*, 582 F.2d 424 (7th Cir.1978).

2. As a result of the priority accorded to Fedwire entries, specific relief in the form of a direction to the Treasury to make payment inconsistent with those entries, or to the Reserve Bank to transfer the securities without the instruction of the subsection (a) transferee, would be inappropriate. However, the courts have adequate alternatives to enforce an adjudication of rights in a security.

3. *Cf.* U.C.C. § 8–318 (an agent or bailee acting in good faith is not liable for conversion even if his principal had no authority to act).

4. *See* Appendix to memorandum of law, pp. 5–6.

5. Treasury defined the term "pledge" as a "pledge of, or any other security interest in, Treasury securities as collateral for loans or advances...." 31 C.F.R. § 306.115(e). Treasury therefore intended a pledge of book-entry securities to create "an interest in personal property ... which secures payment ... of an obligation." Section 1–201(37). As such, a *pledge of book-entry securities constitutes a* "security [interest] created ... by pledge" within the meaning of Article 9 of the Uniform Commercial Code. As a result, a pledge perfected under subsection (a) is intended to vest the pledgee with the substantive rights of a secured creditor under State law.

APPENDIX—Continued

ties under subsection (b).[6] As we understand the facts of this case, no entry of pledge is alleged to have been made on the books of a Reserve Bank.

We hope that this letter helps clarify the interpretation of 31 C.F.R. § 306.118 contained in our memorandum of law. We will gladly supply additional materials at your Honor's request.

Respectfully,

Rudolph W. Giuliani
United States Attorney for the Southern
    District of New York
Attorney for United States Department
    of the Treasury
United States Courthouse Annex
One St. Andrew Plaza
New York, New York 10007
(212) 791–0055

James H. Oltman
Attorney for Federal Reserve Bank of
    New York, Board of Governors of
    the Federal Reserve System, and
    Federal Open Market Committee
Federal Reserve Bank of New York
33 Liberty Street
New York, New York 10045
(212) 791–5025

By: /s/ _____
          PAUL K. MILMED
    Assistant United States Attorney

By: /s/ _____
         MARYSUE SULLIVAN
    Assistant Counsel

cc: DEWEY, BALLANTINE, BUSHBY, PALMER & WOOD, ESQS.
    140 Broadway
    New York, New York, 10005
    Attorneys for Plaintiffs

    SULLIVAN & CROMWELL, ESQS.
    125 Broad Street
    New York, New York 10004
    Attorneys for Defendant Marine Midland Bank, N.A.

    STATMEN, TRUSTER & GLOTT, ESQS.
    3699 Wilshire Boulevard—9th Floor
    Los Angeles, California 90010
    Attorneys for Defendant Comark Government Securities, Inc.

    LYNCH BOWIN BURNBAUM & CRYSTAL
    30 Broad Street
    New York, New York 10004
    Attorneys for Third-Party Defendant E. Keith Owens

    ROBERT W. BELL
    441 O'Campo Drive
    Pacific Palisades, California 40272

---

**6.** 31 C.F.R. § 306.118(a).